Thomas C. Horne
Attorney General

Michael E. Gottfried, Bar No. 010623
Lucy M. Rand, Bar No. 026919
Assistant Attorneys General
1275 W. Washington Street
Phoenix, Arizona 85007-2926
Telephone: (602) 542-1610
Fax: (602) 542-7670
E-mail: Michael.Gottfried@azag.gov
Lucy.Rand@azag.gov

*Attorneys for Defendants*

# UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| Kini M. Seawright; *et al.*, <br><br> Plaintiff, <br><br> v. <br><br> State of Arizona; *et al.*, <br><br> Defendants. | No. CV11-01304-PHX-JAT <br><br> **DEFENDANTS' SEPARATE STATEMENT OF FACTS IN SUPPORT OF SUMMARY JUDGMENT** |

Defendants[1], through undersigned counsel, pursuant to Fed. R. Civ. P. 56(c) and LRCiv 56.1(a), submit their separate statement of facts in support of summary judgment.

1. Dana Seawright, ADC #195344, was a felon incarcerated with the Arizona Department of Correction ("ADC") for the third time.[2] (Certified Public Adult Information Management System (AIMS) Report of Dana Seawright (Feb. 22, 2013), attached hereto as Exhibit A and incorporated herein by this reference.) Seawright was

---

[1] Defendants are the State of Arizona, Edna Jackson-Bey, Clayton Thompson, and Jennifer Blondin.

[2] Seawright was first committed to ADC on May 24, 2005 for charges involving dangerous drug violation, criminal damage and aggravated assault. On June 25, 2008, Seawright was re-committed to ADC for two counts of unlawful use of means of transportation. At the time of his death, Seawright was serving out a twelve-year sentence for dangerous drug violation, unlawful use of means of transportation, two counts of marijuana violation and four counts of drug paraphernalia. (Ex. A.)

#3111394

1  committed to the ADC on or about November 24, 2009, to serve out a twelve-year
2  sentence related to various felony charges. (*Id.*)

3  **ASPC-Lewis-Stiner, Dorm 2**

4  2. The Arizona State Prison Complex ("ASPC")-Lewis ("Lewis") is
5  comprised of six prison units, with an additional three units located across the highway,
6  and is located in Buckeye, Arizona. (Declaration of Keith Smith at ¶ 3 (Feb. 28, 2013)
7  (hereinafter "Smith at __"), attached hereto as Exhibit B and incorporated herein by this
8  reference; *see* Declaration of Custodian of Records (02/28/2013), attached hereto as
9  Exhibit I and incorporated herein by this reference.)

10  3. At the main Lewis complex there are three units on the west side of the
11  complex—Rast Unit, Buckley Unit, and Morey Unit—and three units on the east side of
12  the complex—Bachman Unit, Barchey Unit, and Stiner Unit ("Stiner"). (*Id.*)

13  4. The main Stiner yard[3] is comprised of six dormitory-style housing units
14  (numbered 1-6), as well as other buildings, such as a kitchen and dining hall, and
15  classrooms and administrative offices. (*Id.* at 4; Declaration of Edna Jackson-Bey at ¶ 3
16  (Feb. 27, 2013) (hereinafter "Jackson-Bey at __"), attached hereto as Exhibit C and
17  incorporated herein by this reference; *see* Ex. I.)

18  5. Stiner is divided into two yards by a physical barrier, *i.e.*, a security fence,
19  with a guard tower between the two yards. (Smith at 4.)

20  6. Dorms 1 through 3 are located on the Blue Yard and Dorms 4 through 6
21  are located on the Red Yard. (*Id.*)

22  7. The yards are used mainly for recreation. (*Id.*)

23  8. Each Stiner dorm houses approximately 184 inmates and is identical in
24  layout. (Smith at 5; Jackson-Bey at 4.)

---

[3]  The Detention Unit is not considered part of the main Stiner yard. It is located to the west of the main Stiner yard, is separated by a security fence, and requires ingress and egress through a specific gate. The Detention Unit houses maximum security inmates.

#3111394 – DFS' SSOF iso MSJ                 2

9. A dorm consists of six separate living areas or "pods" (also known as "runs") labeled A through F.[4] (*Id.*)

10. Each pod houses between 35 to 40 inmates and has communal toilets, urinals, showers and sinks, as well as a common "Day Room" for inmate use. (*Id.*)

11. Located in the center of the dorm is a control room for staff, and staff offices are also located nearby. (*Id.*)

12. The inmate living areas have beds on each side of the pod, some are single beds and some are bunk beds. (*Id.*)

13. In Dorm 2, lockers, three to four feet in height, separate the bed areas. (*Id.*)

14. At the time, the Stiner dorms housed medium security inmates. (Smith at 6; Jackson-Bey at 3.)

15. These inmates had demonstrated that they were not physical threats to other inmates and were, therefore, housed in dormitory-style housing. (Smith at 6; Jackson-Bey at 16.)

16. Inmates generally were free to move around within the yard, the dorm, and the pods without an officer escort. (*Id.*)

17. During turn out for work, health care appointments, library visits, educational classes, and meals, inmates traveled to and from their destinations without being accompanied by an officer (Smith at 6); however, it was not unusual for an officer to be located outside of the dorm visually monitoring the inmates (*id.*; Jackson-Bey at 16.)

18. Within the dorm, all pod doors remained open from 6:00 a.m. to 8:30 p.m.[5] (Smith at 7.)

---

[4] Pods A through F are also known as Able Pod, Baker Pod, Charlie Pod, Dog Pod, Echo Pod, and Fox pod, respectively.

[5] Except when the pod doors were required to be closed during formal and emergency counts.

19. All inmates could make use of the Day Room, and inmates with phase two or phase three privileges could visit inmates in other pods. (*Id.*)

20. On July 2 and 3, 2010, Seawright was housed at Stiner Dorm 2 ("Dorm 2"). (Doc. 53 at 4, ¶ 21; Smith at 2.)

21. On July 2, 2010, in order to accommodate newly arrived inmates, Seawright was moved from Dorm 2, Pod F, to Dorm 2, Pod D. (Doc. 53 at 4, ¶ 21.)

**Staffing**

22. The ADC's Central Office established standardized staffing patterns for all institutions. (Smith at 8.)

23. On July 3, 2010, DO 524 dated November 24, 2009, was in effect. (*Id.*)

24. Wardens in coordination with the Central Office established post charts to provide that adequate staff was assigned based on the needs of the institution. (Smith at 9.)

25. Shift Lieutenants scheduled and maintained adequate staffing using shift rosters and addressed irregularities in staffing patterns with the unit Deputy Warden and/or Chief of Security. (*Id.*)

26. Irregularities in staffing could have been caused by such things as employee vacancies, employees on leave, and unplanned absences. (*Id.*)

27. When there were insufficient employees to staff every post, modifications to staffing were made. (*Id.*)

28. In some cases, a staff member was "cross-leveled" or sent from his/her assigned unit to assist another unit. (Smith at 10.)

29. At the start of each shift, the unit Shift Commander would notify the Complex Shift Commander of staffing total changes for cross-leveling. (*Id.*)

30. On July 3, 2010, Sgt. Thompson was the unit Shift Commander at Stiner. (*Id.*)

1      31.    Then immediately after the beginning of a shift, the Complex Shift
2 Commander would reconcile institutional staffing levels and make the decision to cross-
3 level staff based on the needs of each unit. (Smith at 11.)
4      32.    In addition, some staff may be unavailable because they were given special
5 assignments in other locations. (Smith at 12.)
6      33.    Sgt. Thompson had no control over the ultimate number of staff available
7 for work at Stiner on July 3, 2010. (Smith at 13.)
8      34.    Based on the ultimate number of staff available, a post could be
9 "collapsed", which means that a post did not have a dedicated employee assigned.
10 (Smith at 14.)
11      35.    Instead, an employee(s) already assigned to a post would take on the
12 additional assignment of also covering the "collapsed" post. (*Id.*)
13      36.    This ensured that each dorm received the required inmate security checks,
14 which were required to be performed twice per hour but not at regular times or intervals.
15 (*Id.*)
16      37.    On the post collapse chart beginning at the bottom, the column farthest to
17 the left contains numbers (1 through 18), which represent the number of employees
18 staffed. (Smith at 15.)
19      38.    The third column from the left entitled "Days" lists the corresponding post
20 to be collapsed based on the number of employees staffed. (*Id.*)
21      39.    For example, if there were 18 employees staffed the Stiner Dorm 6 Floor
22 Officer post would be collapsed; if there were 17 employees staffed the Stiner Dorm 1
23 Floor Officer post would be collapsed; if there were 16 employees staffed the Stiner
24 Blue Yard 3 post would be collapsed; if there were 15 employees staffed the Stiner
25 Dorm 4 Control Officer post would be collapsed; if there were 14 employees staffed the
26 Stiner Dorm 3 Control Officer post would be collapsed; and, if there were 13 employees
27
28

1  staffed the Stiner Dorm 6 Control Officer post would be collapsed (but only after
2  authorization by the Deputy Warden or his designee). (*Id.*)

3      40. On July 3, 2010, according to the Stiner Cross-Leveling chart, the Dorm
4  Control Officer for Dorm 3 was cross-leveled from Stiner Unit to Buckley Unit. (Smith
5  at 16-17.) This is represented by a "-1" under the column entitled "Stiner" and by a "+1"
6  under the column entitled "Buckley." (Smith at 16.)

7      41. On July 3, 2010, according to the ASPC-Lewis Staffing Numbers, Stiner
8  had sixteen employees scheduled, which is shown on the "Stiner" "Unit" horizontal line,
9  under the "Roster" column. (Smith at 17.)

10     42. Four of the sixteen employees were on special assignment, which is shown
11 on the "Stiner" "Unit" horizontal line, under the "Special Assign" column. (*Id.*) The
12 number of employees staffed on that day was twelve, which is shown on the "Stiner"
13 "Unit" horizontal line, under the "Actual" column. (*Id.*)

14     43. These staffing numbers resulted in each of Stiner's Dorms 1 through 6 only
15 having the Dorm Control Officer post staffed, leaving the Dorm Floor Officer unstaffed
16 or "collapsed", and the Dorm Control Officer performing the duties of both the Dorm
17 Control and Dorm Floor officer. (Smith at 18.)

18     44. At 7:15 a.m., the Dorm Control Officer for Dorm 3 left Stiner Unit to
19 cross-level to Buckley Unit, as ordered by the Complex Shift Commander. (Smith at
20 19.)

21     45. Based on the Stiner Post Collapse Chart, the first post to be collapsed
22 (based on 18 employees) would have been the Stiner Dorm 6 Floor Officer post;
23 however, this post was already collapsed. (Smith at 20.)

24     46. The next post to be collapsed (based on 17 employees) would have been
25 the Stiner Dorm 1 Floor Officer post; however, this post was also already collapsed.
26 (*Id.*) The next post to be collapsed (based on 16 employees) would have been the Stiner
27 Blue Yard 3 post; however, this post was also already collapsed. (*Id.*)

28

47. Based on the Stiner Post Collapse Chart, the next post to be collapsed (based on 15 employees) would have been the Stiner Dorm 4 Control Officer post; however, Sgt. Thompson did not collapse this post. (Smith at 21.)

48. The next post to be collapsed (based on 14 employees) would have been the Stiner Dorm 3 Control Officer post; however, this post was already collapsed due to the officer being cross-leveled from Stiner to Buckley Unit. (Smith at 16-17, 22.)

49. The next post to be collapsed (based on 13 employees) would have been the Stiner Dorm 6 Control Officer post. (Smith at 23.) According to the Stiner Priority Collapse Chart, anytime staff numbers fell below fourteen, the Deputy Warden was to be notified. (*Id.*)

50. Further, in order to collapse this post, the Deputy Warden had to provide authorization. (*Id.*)

51. Sgt. Thompson called the Deputy Warden to obtain authorization to collapse this post; however, Sgt. Thompson did not receive a response. (*Id.*)

52. Sgt. Thompson did not collapse this post. (*Id.*)

53. Sgt. Thompson's staffing decisions did not adversely affect the coverage of the yards. (Smith at 24.) Sgt. Thompson was balancing the staffing needs of six dorms, Dorms 1 through 3 on the Blue yard and Dorms 4 through 6 on the Red yard. (*Id.*)

54. As a result of Sgt. Thompson not collapsing the Stiner Dorm 4 Control Officer post or the Dorm 6 Control Officer post, there were two officers covering three dorms on the Blue Yard, and three officers covering three dorms on the Red Yard. (*Id.*)

55. Had Sgt. Thompson followed the Post Priority Collapse Chart, the end result would have been virtually the same; there would have been three officers covering three dorms on one yard and two officers covering three dorms on the other yard. (Smith at 25.) However to arrive to this position, Sgt. Thompson would have had to move an officer from the Red Yard to the Blue Yard, which would have resulted in the moving

1  officer not being at any post during the transition and only two officers posted on each
2  yard during the transition. (*Id.*)

3      56.    Further, to collapse Dorm 6, Sgt. Thompson would have had to reassign
4  the Dorm 6 officer to Dorm 4, which would have resulted in shuffling the officers to
5  arrive at the same result. (Smith at 26.)

6      57.    Sgt. Thompson's decision caused the least amount of disruption to arrive at
7  virtually the same staffing result, involved zero moves of officers between yards,
8  allowed the greatest number of officers to be at their posts for the greatest amount of
9  time, and did not increase the risk to any inmates, including the inmates in Dorm 2.
10 (Smith at 27.)

11     58.    In reviewing Sgt. Thompson's deposition on August 7, 2012, he apparently
12 misremembered which dorms he actually collapsed. (Smith at 28.)

13     59.    From Smith's review of the staffing records, the dorms were collapsed as
14 set forth in Smith's Declaration. (*Id.*)

15     60.    Regardless of which actual dorms were collapsed, the staffing set out by
16 Sgt. Thompson did not increase the risk to any inmates, including the inmates in Dorm 2.
17 (Smith at 29.)

18     61.    It was and is acceptable correctional practice to have one officer
19 responsible for performing inmate security checks for two medium-custody dorms at the
20 same time, as the inmate checks are still physically conducted twice per hour. (Smith at
21 30.)

22 **Sgt. Clayton Thompson**

23     62.    On July 3, 2010, Defendant Clayton Thompson was a Correctional
24 Sergeant assigned to the Stiner Unit. (Deposition of Clayton Thompson at 26:14-16
25 (Aug. 7, 2012) (hereinafter "Thompson Depo. at __"), attached hereto as Exhibit D and
26 incorporated herein by this reference.

27
28

1    63.    On July 3, 2010, Thompson worked the day shift, which began at 6:00 a.m.
2  and ended at 2:00 p.m. (*Id*. at 26:14-16; 28:5-10.)

3    64.    Each morning, one of Sgt. Thompson's first tasks was to review that day's
4  roster or shift staffing roster. (*Id*. at 28:14-19.) The roster for Stiner indicated who was
5  available to work that day at the various Stiner posts due to staff calling out, being on
6  scheduled leave, or on special assignment. (*Id*. at 29:13-25; 30:1-25.)

7    65.    On July 3, 2010, the shift roster indicated that the Stiner would be
8  short-staffed. (*Id*. at 31:1-5.) That is, the number of staff available to be posted at the
9  Stiner Unit would be less than the standard allocation. (*Id*. at 36:9-14.)

10   66.    Because of this staffing shortage, Sgt. Thompson was required to notify the
11  Stiner Unit Deputy Warden. (*Id*. at 31:1-9.) He did; Sgt. Thompson called and left a
12  message for Stiner Deputy Warden McCarville advising him of the shortage. (*Id*. at
13  31:18-24; 35:4-8, 14-16.)

14   67.    Because he was unable to reach Deputy Warden McCarville, Sgt.
15  Thompson had to make staffing decisions due to the staffing issues. (*Id*. at 44:20-23.)

16   68.    It was breakfast time and the inmates had to eat, Sgt. Thompson decided to
17  collapse the unit. (*Id*. at 44:24-25; 45:1; 46:7-9.)

18   69.    Collapsing the unit is a method to make sure that each dorm received the
19  required security and inmate welfare checks. (*Id*. at 46:10-22.) These inmate security
20  checks were required to be conducted twice each hour, but not at regular times or
21  intervals during the hour. (Jackson-Bey at 7.)

22   70.    Typically each dorm was staffed with a "Dorm Control Officer" and
23  "Housing Unit Floor Office". The duties of a Housing Unit Security Officer is described
24  in Stiner Post Order ("PO") PO-054-STI. Officers assigned to work a dormitory were
25  either assigned to the post of "Dorm Officer" or "Floor Officer". The Dorm Officer post
26  had to be assigned and could not be collapsed. If the Floor Officer post was collapsed,
27  the Dorm Officer was responsible for the duties of both posts. The duties of a Housing

28

Officer are generally described in Stiner Post Order ("PO") PO-054-STI, effective January 7, 2009. (Jackson-Bey at Attachment B.) Specific duties of a Dorm Officer are described at § 054.14, Subsection 1.1. (*Id.*) These duties included conducting inmate "security checks". (*Id.* at § 054.14, Subsection 1.1.5; Jackson-Bey at 6.)

71. In July 2010, collapsing the unit meant that one officer would do the security check, count, and all other required activities for each dorm. (Thompson Depo. at 54:20-25; 55:1.) Officers would be assigned more than one dorm to ___.

72. Due to staffing issues, Sgt. Thompson directed that Officer Blondin would be responsible for inmate security checks in Dorm 2 (Use of Force/Incident Management Report #10-L02-1729 at bates number 0028 (AIR) (Jul. 3, 2010) (hereinafter "IMS Rpt. at __"), attached hereto as Exhibit E and incorporated herein by this reference; *see* Ex. I.) and jointly responsible for inmate security checks in Dorm 3 (*id*; Jackson-Bey at 9), and Officer Jackson-Bey would be responsible for inmate security checks in Dorm 1 and jointly responsible for inmate security checks in Dorm 3 (Jackson-Bey at 9).

73. Sgt. Thompson did not know inmate Seawright, had never seen him, and did not know if he had any gang-affiliations, before the July 3 assault. (Thompson Depo. at 40:5-15.)

74. Sgt. Thompson did not know of any relationship inmate Seawright had with other inmates before the July 3 assault. (*Id*. at 40:16-21.)

75. Sgt. Thompson learned after the July 3 assault that inmate Seawright was in a scuffle with another inmate. (*Id*. at 40:21-25; 41:1-5.)

76. Sgt. Thompson also learned after the July 3 assault that after this scuffle inmate Seawright was moved to the 2-D run and the other inmate was moved to the other side of the yard. (*Id*.)

77. Sgt. Thompson did not know, either before or after July 3, that inmate Seawright had changed housing assignments the day before the July 3 assault. (*Id*. at 42:6-10.)

78. According to the Stiner unit collapse chart, dorms 2 and 5 were supposed to be collapsed first. On July 3, Sgt. Thompson instead collapsed dorms 3 and 6. (Thompson at 79:17-22.)

79. The fact that dorms 3 and 6 were collapsed instead of dorms 2 and 5 had no effect on what happened to inmate Seawright. (*Id.* at 80:18-24.)

**Officer Jennifer Blondin**

80. On July 3, 2010, Correctional Officer ("CO") II Blondin was assigned as the Dorm 2 Control Room Officer and arrived at work at approximately 5:45 a.m. (Ex. E, IMS Rpt. at 0028 (AIR).)

81. At approximately 6:00 a.m., Officer Blondin arrived at her post at Stiner Dorm 2 and began the Dorm Officer duties by starting the Correctional Log for Dorm 2. (*Id.*)

82. At approximately 6:30 a.m., Officer Blondin conducted a security check in Dorm 2. (*Id.*) These checks are required to be done twice each hour, but not at regular times or intervals during the hour. (Jackson-Bey at Attachment B, § 054.14, Subsection 1.15 *et seq*; Deposition of Jennifer Blondin at 41:1-3, 16-24 (Aug. 27, 2012) (hereinafter "Blondin Depo. at __"), attached at Exhibit F and incorporated herein by this reference.) Security checks involved walking up and down the runs that are within the dorms and checking every inmate to make sure that they are alive and breathing. (*Id.* at 43:16-20.) Dorm 2 was secure at that time. (Ex. E, IMS Rpt. at 0028 (AIR).)

83. At approximately 6:59 a.m., Officer Blondin conducted another security check of Dorm 2. (Correctional Service Log for ASPC-Lewis-Stiner Unit, Dorm 2 (07/03/2010), attached hereto at Exhibit G and incorporated herein by this reference; *see* Ex. I.)

84. At approximately 7:10 a.m., Officer Blondin began the "turn out" of Dorm 2 inmates for breakfast. (*Id.*)

85. At approximately 7:22 a.m., Officer Blondin conducted another security check of Dorm 2. (*Id.*) Officer Blondin observed that all inmates in Dorm 2 were living and breathing and there were not any security issues. (*Id.*)

86. At approximately 7:30 a.m., Sgt. Thompson advised Officer Blondin that because of staffing issues she would be assigned as the Floor Officer for both Dorms 2 and 3. (*Id.*)

87. This was commonly known as collapsing posts. (Blondin Depo. at 45:1-5.)

88. When assigned to two posts, Officer Blondin spent the majority of her time conducting security checks and was unable to perform all of the duties for both posts. (*Id.* at 83:21-25; 84:1-10.)

89. Officer Blondin recorded all Inmate Welfare Checks she conducted, as well as other types of security checks and inspections, in the Correctional Service Journal. (Defendant Blondin's Response to Plaintiff's First Set of Interrogatories at Response to Interrogatory No. 7 (03/26/2012), attached hereto at Exhibit H and incorporated herein by this reference.)

90. At approximately 7:40 a.m., Officer Blondin continued to monitor and supervise the inmates returning from chow. (Ex. F, IMS Rpt. at 0028 (AIR).)

91. Once all of the inmates were inside of Dorm 2, she began to lock down Dorm 2. (*Id.*)

92. Shortly after 7:40 a.m., Officer Blondin gave the Dorm 2 keys to CO II Jackson-Bey so that she could finish securing the Dorm 2 inmates. (*Id.*)

93. Officer Blondin left Dorm 2 and went to Dorm 3 to release the Dorm 3 inmates to the dining hall for breakfast. (*Id.*)

94. At approximately 7:56 a.m., while Officer Blondin was at Dorm 3, CO II Jackson-Bey initiated the Incident Command System (ICS) and Officer Blondin heard that inmate Seawright was found injured in Dorm 2. (*Id.*)

95. At approximately 7:57 a.m., Officer Blondin arrived at Dorm 2, all inmates in the Dorm 2 D Pod were secured in the Dorm 2 inmate Day Room, and Officer Blondin was stationed at the Day Room door to monitor the inmates. (*Id.*)

96. Officer Blondin had no information or suspicion that there were any issues or threats involving inmate Seawright before this assault. (Blondin Depo. at 23:1-18.)

97. It is not unusual for a correctional officer to cover two dorms at one time. (*Id.* at 32:10-13.)

**Officer Edna Jackson-Bey**

98. On July 3, 2010, Officer Jackson-Bey was assigned as the day-shift Dorm-1 Control Room Officer and arrived at work at approximately 5:45 a.m. (Jackson–Bey at 6.) She attended the morning briefing and learned that there was not a Housing Security Officer on day shift and that she would be performing the duties of both the Dorm Officer and the Floor Officer, which included conducting inmate security (also known as inmate health and welfare checks) checks. (*Id.*)

99. On July 3, 2010, prior to the incident, Officer Jackson-Bey was responsible for inmate security (health and welfare) checks in Dorm 1. (Jackson-Bey at 7.) Such inmate checks were conducted within each pod/run by confirming each inmate's well-being by observing "living breathing flesh." (*Id.*) These inmate security checks were required to be conducted twice each hour, but not at regular times or intervals during the hour. (*Id.*) If done at regular intervals, inmates would know when they were not being observed. (*Id.*) Officer Jackson-Bey conducted these inmate checks by walking down each run, observing the inmates, and checking for any security issues or problems. (*Id.*)

100. Due to staffing issues, Sgt. Thompson directed that Officer Jackson-Bey was to be jointly responsible with another correctional officer for inmate security checks in Dorm 3. (Jackson-Bey at 8.) CO II Herrera and CO II Jackson-Bey were responsible for inmate security checks in Dorm 3 from approximately 6:00 a.m. to approximately

1  7:15 a.m., and CO II Blondin and CO II Jackson-Bey were responsible for inmate
2  security checks from approximately 7:28 a.m. to approximately 7:56 a.m. (*Id.*)

3      101.    Officer Jackson-Bey was not responsible for conducting inmate security
4  checks in Dorm 2 at any time on July 3, 2010. (Jackson–Bey at 9.)

5      102.    Sometime shortly before 7:56 a.m. that morning—Officer Jackson-Bey is
6  not sure of the exact time only that it was shortly before she initiated the Incident
7  Command System (ICS) at 7:56 a.m.—Officer Blondin gave Officer Jackson-Bey the
8  Dorm 2 keys so that Officer Jackson-Bey could continue to secure the Dorm 2 inmates
9  returning from the dining hall. (Jackson–Bey at 10.) Securing inmates returning from
10 the dining hall required Officer Jackson-Bey to close and lock (secure) the remaining
11 open pod doors, which were Pods D, E, and F, and to secure the main door to Dorm 2.
12 (*Id.*) Due to staffing issues, CO II Blondin went to "turn out" the Dorm 3 inmates to the
13 dining hall for their breakfast. (*Id.*)

14     103.    Officer Jackson-Bey had completed securing the pod doors in Dorm 2 and
15 was about to exit Dorm 2 when she heard banging on a window. (Jackson–Bey at 11.)
16 She turned and noticed the sound was coming from Pod D. (*Id.*) Officer Jackson-Bey
17 went to the Pod D door, saw two inmates banging on the glass, and went in. (*Id.*) An
18 inmate told Officer Jackson-Bey that she needed to call medical. (*Id.*)

19     104.    The inmates brought Officer Jackson-Bey to where inmate Seawright was
20 lying in his bunk, making a sound as if he was snoring. (Jackson–Bey at 12.) She
21 moved closer, however, and saw blood. (*Id.*) Officer Jackson-Bey immediately initiated
22 ICS and called for a supervisor. (*Id.*)

23     105.    "ICS" is an acronym for Incident Command System, which consists of
24 specific, progressive, proactive and reactive step-by-step procedures that allow for the
25 flexible response to situations of any magnitude. (*Id.*) It involves, among other things, a
26 radio call to all available officers to respond to a situation. (*Id.*) Officers are required to
27 initiate ICS in situations involving an injury or assault. (*Id.*)

28

106. The supervisor immediately was on the scene, assumed command as incident commander and, among other calls, called 911. (*Id.*)

107. On July 2, 2010, the date of Seawright's alleged incident with another inmate, Officer Jackson-Bey was not assigned to Dorm 2, Seawright's dorm. (Jackson–Bey at 13.) Officer Jackson-Bey was assigned to Dorm 6 and had no involvement, interaction or knowledge about or with inmate Seawright. (*Id.*)

108. Officer Jackson-Bey had no information or suspicion that there were any issues or threats involving inmate Seawright before this assault. (Jackson–Bey at 14)

109. On July 3, 2010, Officer Jackson-Bey was not assigned to Dorm 2 until just prior to the incident and was not aware of any issue relating to inmate Seawright or his safety. (Jackson–Bey at 15.)

110. It is and was not unusual for a correctional officer to be located outside of the dorm during turn out for chow. (Jackson–Bey at 17.)

111. Officer Jackson-Bey was not aware of any additional danger to inmates that would be a result of the collapse of the units. (Jackson–Bey at 18.) Security checks were still to being conducted twice per hour. (*Id.*)

112. The activities and checks that Officer Jackson-Bey performed on July 3, 2010, were similar to the numerous security checks that she has performed in the past and she had no reason to believe that any inmate would be in danger by following these procedures. (Jackson–Bey at 19.)

RESPECTFULLY SUBMITTED this 28th day of February, 2013.

Thomas C. Horne
Attorney General

s/Michael E. Gottfried
Michael E. Gottfried
Lucy M. Rand
Assistant Attorneys General
*Attorneys for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 28, 2013, I electronically transmitted the attached document to the Clerk of the Court using the ECF System. This document and the Notice of Electronic Filing were automatically served on the same date to the following, who are registered participants of the CM/ECF System:

DeeAn Gillespie, Esq.
Amy Wallace, Esq.
GILLESPIE, SHIELDS & DURRANT
7319 North Sixteenth Street, #100
Phoenix, Arizona 85020-5262
*Attorneys for Plaintiff*

s/Lucy M. Rand
Lucy M. Rand