**Dan M. Durrant #001763**
**GILLESPIE, SHIELDS & DURRANT**
7319 N. 16th Street
Phoenix, Arizona 85020
Telephone: (602) 870-9700
Facsimile:  (602) 870-9783
ddurrant@gillaw.com
ldittemore@gillaw.com
*Attorneys for Plaintiff*

Send Court Documents to:
mailroom@gillaw.com

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

Kini M. Seawright; *et al.*,

              Plaintiff,

vs.

State of Arizona, *et al.*,

              Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

**Case # CV 11-01304-PHX-JAT**

**PLAINTIFFS' CONTROVERTING STATEMENT OF FACTS AND SEPARATE STATEMENT OF FACTS**

     Plaintiffs Kini Seawright and the Estate of Dana Seawright (hereinafter referred to collectively as "Plaintiffs"), by and through undersigned counsel, and pursuant to Rule 56.1 Local Rules of Practice for the United States District Court for the District of Arizona, hereby submit their Controverting Statement of Facts and Separate Statement of Facts in support of Plaintiffs' Response to Defendants' Motion for Summary Judgment.

### CONTROVERTING STATEMENT OF FACTS

1. Uncontroverted.

2. Uncontroverted.

3. Uncontroverted.

4. Uncontroverted.

5. Uncontroverted.

6.   Uncontroverted.

7.   Uncontroverted.

8.   Uncontroverted.

9.   Uncontroverted.

10. Uncontroverted.

11. Uncontroverted.

12. Uncontroverted.

13. Uncontroverted.

14. Uncontroverted.

15. Controverted.  There is evidence that there were several assaults on homosexuals in the Stiner Unit prior to Seawright's assault.  (Plaintiffs' Separate Statement of Facts "PSSOF[1]" Ex. 9 "Investigations Report; Ex. 13 7/8/2010 Information Report)

16. Uncontroverted.

17. Uncontroverted.

18. Controverted.  The day of Seawright's assault, the pod doors were being repeatedly locked down by Jackson-Bey and Blondin despite the policy that the pod doors were to remain open.  (Ex. 18, 7/3/10 Use of Force / Incident Management Report by Jackson-Bey stating: "I was complete with securing all the pod doors in H/U 2 …."; Ex. 4 Jackson-Bey Depo. pp. 33 lines 1-4; 61 lines 5-21, 59 lines 11-14; Ex. 5, Blondin Depo. p. 74, lines 18-25, p. 75 lines 1-5, p. 72 lines 14-20).

19. Uncontroverted.

20. Uncontroverted.

21. Controverted.  There is significant evidence that Seawright was moved the day before the assault because of a fight that occurred in Dorm 2 F-pod between Seawright and his homosexual

---

[1] All Exhibits referred to in this Controverting Statement of Facts are attached to Plaintiff's Separate Statement of Facts.

partner.  (Ex. 9 "Investigations Report" p. 3; Ex. 13, 7/8/2010 Information Report; Ex. 2, Thompson Depo. p. 40 lines 22-25; p. 41 liens 1-11).

22. Uncontroverted.

23. Uncontroverted.

24. Controverted. There are issues of fact regarding whether adequate staff was assigned the day of Seawright's assault.  Even Stiner's Post Order requires that Dormitories are "manned at all times" but entire dormitories were left unattended on July 3, 2010.  (Exhibit 1, ASPC-Lewis Staffing Numbers; Exhibit 2, Clayton Thompson Depo. p. 84, lines 10-25; p. 85 lines 1-25; p. 86 lines 1-8; p. 45 lines 11-14;. p. 31, lines 1-13; p. 32, lines 2-6; p. 34 lines 11-21, p. 46 lines 10-25, p. 47, lines 1-11, p. 47 lines 7-17, p. 53, lines 1-12, p. 61, lines 5-7, p. 63 lines 4-25, p. 79 lines 17-22, p. 88 lines 1-12; Exhibit 3, Stiner Post Order, p. 9, policy 054.14; Exhibit 4, Jackson-Bey Depo. pp.96-98, p. 56 lines 7-17, p. 57, lines 7-15, ; Ex. 15, 8/24/10 Investigative Report # 2010-0893, p. 3-6; Ex. 5, Blondin Depo. p. 69 lines 22-24, p. 59 lines 4-8).

25. Controverted.  The staff levels were not adequate.  See 24, above.

26. Uncontroverted.

27. Uncontroverted.

28. Uncontroverted.

29. Uncontroverted.

30. Uncontroverted.

31. Uncontroverted.

32. Uncontroverted.

33. Controverted.  Sergeant Thompson could have and should have ensured he talked to his deputy warden or warden when his staffing levels were dangerously low.  As Plaintiffs concede, staff from other facilities could have been cross-leveled over to Stiner to assist in making sure there was adequate staff.  (Ex. 2, Thompson Depo. p. 32, lines 2-6; p. 34 lines 11-21).

34. Uncontroverted.

35. Uncontroverted.

36. Controverted. There is overwhelming evidence that the required two security checks per hour were not performed in Stiner for both Dorm 1 and Dorm 2 on July 3, 2010. (Ex. 4, Jackson-Bey Deposition p. 34, lines 14-16, p. 36 lines 1-2, p. 39, lines 16-25; p. 40, lines 1-21; p. 41, lines 3-14, p. 85, lines 1-6; lines 17-19, pp. 91-92, pp. 96 to 98; Ex. 5, Blondin Deposition p. 40, lines 1-11, p. 41, lines 1-15, p. 44, lines 22-24, p. 56 lines 18-24; p. 92, lines 11-16; Exhibit 6, 7/3/10 Correctional Service Log for Dorm 2 by Officer Blondin).

37. Uncontroverted.

38. Uncontroverted.

39. Uncontroverted.

40. Uncontroverted.

41. Controverted.  24 employees were required.  16 were on the "Roster" but only 11 were working at Stiner on July 3, 2010 when Seawright was assaulted.  (Ex. 1 ASPC-Lewis Staffing Numbers, Filed Under Seal as attachment 5 to Exhibit B of DSSF).

42. Controverted. 12 employees were not staffed at Stiner when Seawright was assaulted. There were only 11 employees at Stiner when the assault on Seawright occurred. (Ex. 1 ASPC-Lewis Staffing Numbers , Filed Under Seal as attachment 5 to Exhibit B of DSSF; Ex. 2, Thompson Depo. p. 85 lines 1-25, p. 86 lines 1-8).

43. Uncontroverted.

44. Controverted.  These staffing numbers resulted in Blue Yard having only two correctional officers in charge of three buildings (i.e. Dormitories). (DSSF ¶ 54; Ex. 2, Thompson Depo. p. 88 lines 1-12). Dorms 1 through 6 did not have the Dorm Control Officer staffed because Dorm 3 did not have a Dorm Control Officer posted. (Ex. 2 Thompson Depo. p. 79 lines 17-22; Ex. 4, Jackson-Bey Depo. p. 52 lines ).

45. Uncontroverted.

46. Uncontroverted.

47. Uncontroverted.

48. Uncontroverted.

49. Controverted and Objection. The copy of the Post Collapse Chart provided by Defendants has the square for 13 employees and "Days" blacked out. Plaintiffs cannot determine the veracity of this assertion given the redacted form of the Post Collapse Chart.

50. Uncontroverted.

51. Uncontroverted.

52. Uncontroverted.

53. Controverted.  Sergeant Thompson's decision to have two instead of three staff members available in the Blue Yard resulted in Seawright's assault because there was no supervision in Dorm 2.  If Dorm 2 had been supervised, Seawright's assault and/or death most likely would not have happened.  (Ex. 23, Post Collapse Chart filed under seal as Attachment 6 to Exhibit B of DSSF; Ex. 15, 8/24/10 Investigative Report, p. 5).

54. Uncontroverted.

55. Controverted. See Response to ¶ 53.

56. Controverted. See Response to ¶ 53.

57. Controverted. Sergeant Thompson's decision to have two instead of three staff members available in the Blue Yard  resulted in Seawright's assault because there was no supervision in Dorm 2.  If Dorm 2 had been supervised, Seawright's assault and/or death most likely would not have happened.  (Ex. 23, Post Collapse Chart filed under seal as Attachment 6 to Exhibit B of DSSF; Ex. 15, 8/24/10 Investigative Report, p. 5).  In addition, it was known that Seawright was in a fight the day before his assault and so the Blue Yard should have had higher priority than the Red Yard to have three staff members instead of two.  (Ex. 2, Thompson Depo. p. 40 lines 22-25; p.41 lines 1-11).  Indeed, the Post Collapse Chart is designed to collapse dormitories in the Red Yard first to give the Blue Yard more staff when there is less staff to work with. (Ex. 23 Post Collapse Chart).  Obviously this Post Collapse Chart was designed this way for a reason. Blondin testified that if the Dorm 3 had not been collapsed that day, somebody would have been in Dorm 2 where Seawright was assaulted at all times.  (Ex. 5, Blondin Depo. p. 69 liens 22-24).

58. Controverted.  Thompson was actually there at the Stiner Unit on July 3, 2010.  He would know more than Smith what dorms had been collapsed.  (Ex. 2, Thompson Depo. p.26)

59. Controverted.  See Response to ¶ 58.

60. Controverted.  See response to ¶ 57.

61. Controverted.  The Stiner Post Order policy requires that the Dorm Officer Post be "manned at all times."  It does not permit for the collapsing of an entire dormitory or for the Dorm Officer position to be collapsed.  (Ex. 3, Stiner Post Order filed under seal as Attachment 2 to Exhibit C of DSSF, p. 9 Policy 054.14; Ex. 2, Thompson Depo. p. 47 lines 7-13).

62. Uncontroverted.

63. Uncontroverted.

64. Uncontroverted.

65. Uncontroverted.

66. Controverted.  Sergeant Thompson did not notify the Deputy Warden.   While Thompson testified he left a voice message on the Deputy Warden's phone, there is no evidence the Deputy Warden received the message.  Sergeant Thompson had other superiors he could have reported this severe staff shortage to, yet did not make any attempts to do so.  (Ex. 2, Thompson Depo. p. 31 lines 4-25, p. 32 lines 1-6, p. 33 lines 14-21).

67. Controverted.  This is a ridiculous statement for Defendants to say that collapsing a unit is a method to make sure security checks are performed.  Collapsing a unit (*i.e.* Dormitory) means that the prison unit (i.e. Stiner) is severely understaffed and that an entire dormitory will be left unsupervised and "unmanned" except for two security checks per hour by a staff member who is already responsible for another dormitory!  (Ex. 2, Thompson Depo. p. 46 lines 10-25; p. 47, lines 1-11).  Collapsing a unit happened rarely and since the Seawright assault does not happen at all! (Ex. 2, Thompson Depo. p. 48, p. 49, lines 23-25, p. 50 lines 1-5).  Defendants are attempting to make it sound like it is a responsible thing to collapse the unit.  It is <u>not</u>.  It results in entire dormitories that house 185 inmates each going unsupervised for 30 minutes <u>or more!</u> (Ex. 15, 8/24/10 Investigative Report p. 6; Ex. 4, Jackson-Bey Depo. p. 57 lines 7-15.

68. Controverted.  Dorm 3 was not collapsed because the inmates had to eat.  Dorm 3 was collapsed because the Control Officer from Dorm 3 was cross-leveled to go work at the Buckley Unit leaving Dorm 3 without <u>any</u> officer.  (Ex. 1 filed under seal as Attachment 5 to Exhibit B of DSSF; DSSF ¶ 40; ¶ 46).

69. Controverted.  See response to ¶ 67, above.

70. Uncontroverted.

71. Controverted and objection.  This statement is incomplete and Plaintiffs do not know how to respond.  The statement is vague as it states that collapsing a unit means that one officer would do …"all other required activities for each dorm."  What does "each dorm" mean?

72. Uncontroverted.

73. Controverted.  Sergeant Thompson had been employed at the Stiner unit since March of 2000 and was promoted to Sergeant in April of 2008. (Ex. 2, Thompson Depo. p. 13 lines 13-19).  He also testified that his job as sergeant is to "supervise both officers and inmates and to keep policy and procedures and regulations running on the whole entire institution."  (Ex. 2, Thompson Depo. p. 14, lines 3-9).   It is uncontroverted that on March 27, 2010 Seawright had a homosexual relationship with a Hispanic which resulted in the Hispanic being beaten up / assaulted and the case number for the assault was 2010-100066. (Ex. 9, Investigations Report, p. 4).  It is not plausible that as the supervisor of the whole entire institution that Thompson did not know anything about Seawright.

74. Controverted.  Sergeant Thompson had been employed at the Stiner unit since March of 2000 and was promoted to Sergeant in April of 2008. (Ex. 2, Thompson Depo. p. 13 lines 13-19).  He also testified that his job as sergeant is to "supervise both officers and inmates and to keep policy and procedures and regulations running on the whole entire institution."  (Ex. 2, Thompson Depo. p. 14, lines 3-9).   It is uncontroverted that on March 27, 2010 Seawright had a homosexual relationship with a Hispanic which resulted in the Hispanic being beaten up / assaulted and the case number for the assault was 2010-100066. (Ex. 9, Investigations Report, p.

4).  It is not plausible that as the supervisor of the whole entire institution that Thompson was not aware of this assault and the victim's homosexual relationship with Seawright.

75. Controverted.  Sergeant Thompson had been employed at the Stiner unit since March of 2000 and was promoted to Sergeant in April of 2008. (Ex. 2, Thompson Depo. p. 13 lines 13-19).  He also testified that his job as sergeant is to "supervise both officers and inmates and to keep policy and procedures and regulations running on the whole entire institution."  (Ex. 2, Thompson Depo. p. 14, lines 3-9).   Seawright was moved to another pod as a result of this fight. It is not plausible that Thompson did not know.

76. Controverted. See response to Sergeant Thompson had been employed at the Stiner unit since March of 2000 and was promoted to Sergeant in April of 2008. (Ex. 2, Thompson Depo. p. 13 lines 13-19).  He also testified that his job as sergeant is to "supervise both officers and inmates and to keep policy and procedures and regulations running on the whole entire institution."  (Ex. 2, Thompson Depo. p. 14, lines 3-9).  It is clear that Seawright was involved in a fight the day before he was moved to D-run and that is why he was moved.  (Ex. 2, Thompson Depo. p. 40, lines 22-25, p. 41 lines 1-11). It is not plausible that Thompson did not know of the fight.

77. Controverted.  Sergeant Thompson had been employed at the Stiner unit since March of 2000 and was promoted to Sergeant in April of 2008. (Ex. 2, Thompson Depo. p. 13 lines 13-19).  He also testified that his job as sergeant is to "supervise both officers and inmates and to keep policy and procedures and regulations running on the whole entire institution."  (Ex. 2, Thompson Depo. p. 14, lines 3-9). It is clear that Seawright was involved in a fight the day before he was moved to D-run and that is why he was moved. (Ex. 2, Thompson Depo. p. 40, lines 22-25, p. 41 lines 1-11). It is not plausible that Thompson did not know that Seawright was moved to a different pod the day before the July 3 assault.

78. Controverted.  The Stiner unit collapse chart shows that Dorms 1 and 6 were to be collapsed first.  (Ex. 23 Post Collapse Chart; DSSF ¶ 47, ¶ 48, ¶ 49).  Collapsing of a unit means that the unit is unmanned and a CO from another building conducts security checks in the

collapsed unit.  This Post Collapse Chart shows that Dorm 6 is the first building that would lose both the Floor and the Dorm Officer and that Dorm 1 would be the next building to be collapsed.

79. Controverted.  The only building or entire housing unit that was collapsed (had nobody assigned to it to "man" it) in Stiner that day was Dorm 3. The Defendants Separate Statement of Facts says Thompson did <u>not</u> collapse Dorm 4 or Dorm 6. (DSSOF ¶¶ 52, 54)  There were three officers in the Red Yard covering the three buildings in Red Yard and only two officers in the Blue Yard covering the three buildings (Dorms 1, 2 and 3) in Blue Yard. (DSSOF ¶ 54).

80. Uncontroverted.

81. Uncontroverted.

82. Uncontroverted.

83. Uncontroverted.

84. Controverted.  Blondin began turning inmates out for breakfast at 6:52. (Ex. 6)

85. Uncontroverted.

86. Controverted.  Blondin's service log shows that she was advised that she would be helping with Dorm 3 at 7:28 a.m.  (Ex. 6, Blondin Service Log for 7/3/2010).

87. Controverted.  This is not known as collapsing a "post" but is known as collapsing a building or housing unit.  Collapsing a "post" means that a Dorm Officer assumes the duties of the Floor Officer in addition to his or her duties as the Dorm Officer.

88. Uncontroverted.

89. Uncontroverted.

90. Controverted.  Blondin's service log shows she left to turn Dorm 3 out to chow at 7:28 a.m. (Ex. 6, Blondin Service Log for 7/3/2010).

91. Controverted.  DSSOF Ex. E does <u>not</u> say that all the inmates were inside of Dorm 2. (Ex. 15, p. 6: Blondin reported that "while the dorm 2 inmates were entering the building, she went to dorm 3 to release those inmates to breakfast."

92. Controverted. Blondin's service log shows she gave the Dorm 2 keys to Jackson-Bey at 7:28 a.m. (Ex. 6, Blondin Service Log for 7/3/2010).

93. Uncontroverted.

94. Controverted.  Jackson-Bey did not initiate ICS.  Jackson-Bey's radio equipment was not working so she had to run out of Dorm 2 to find another CO to initiate ICS.  (Ex. 4 Jackson-Bey Depo. p 29 lines 1-25)

95. Uncontroverted.

96. Controverted.  It is clear that Seawright was involved in a fight the day before he was moved to D-run and that is why he was moved. (Ex. 2, Thompson Depo. p. 40, lines 22-25, p. 41 lines 1-11). (Ex. 24, 07/09/10 Information Report stating that in the Stiner unit "staff are constantly being sent out to cover medical transports because of inmates assaulting other inmates."  It was also known in Stiner that Seawright was a homosexual and at least one of his partners had been assaulted for being gay.  (Ex. 13; Ex. 10, p. 3-5; Ex. 24, 7/9/10 Information Report stating that "staff are constantly being sent out to cover medical transports because of inmates assaulting other inmates."  It was also known in Stiner that Seawright was a homosexual and at least one of his partners had been assaulted for being gay. (Ex. 13; Ex. 10, p. 3-5).).  It is not plausible that Blondin was unaware of a risk to Seawright.

97. Controverted.  It was unusual for a correctional officer to cover two dorms at one time. (Ex. 2, Thompson Depo. p. 48; Ex. 4, Jackson-Bey Depo. p. 96 lines 7-13; p. 97 lines 4-25; p. 98 lines 11-14).

98. Uncontroverted.

99. Controverted.  Jackson-Bey performed only 6 out of the 16 required security checks in Dorm 1 that day.  (Ex. 4, Jackson-Bey Depo. p. 95 lines 15-25; p. 96 lines 1-13).

100.       Objection. This statement is too vague.  What Dorm is it being alleged that Jackson-Bey and Blondin were responsible for inmate security checks from 7:28 a.m. to 7:56 a.m.?  Because of the vague nature of this statement, Plaintiffs controvert this statement.

101.       Uncontroverted.

102.       Uncontroverted.

103.       Uncontroverted.

104.     The only portion that Plaintiffs controvert is that Jackson-Bey initiated ICS. She did not because her radio would not work. (Ex. 4 Jackson-Bey Depo. p 29 lines 1-25).  Another officer initiated ICS.

105.     Uncontroverted.

106.     Controverted.  It took Thompson six minutes to arrive on the scene.  (Ex. 2, Thompson Depo. p. 124 lines 6-23).

107.     Controverted.  Jackson-Bey did take over helping out with Dorm 2 and she was assigned to Dorm 1 and was assisting Blondin with Dorm 3.  Jackson-Bey was not assigned to Dorm 6.  Jackson-Bey knew Seawright and talked with him—calling him a "social butterfly." (Ex. 4, Jackson-Bey Depo. p. 21, p. 2-24).

108.     Controverted.  (Ex. 9; Ex. 10; Ex. 13; Ex. 24)

109.     Controverted. (Ex. 9; Ex. 10; Ex. 13; Ex. 24)

110.     Uncontroverted.

111.     Controverted.  (See response to ¶¶ 99, 36).

112.     Controverted.  (See response to ¶¶ 99, 36)

## PLAINTIFFS' SEPARATE STATEMENT OF FACTS

1.  Dana Seawright ("Seawright") was imprisoned on November 24, 2009 in the Arizona State Prison Complex-Lewis (ASPC-Lewis) for non-dangerous drug crimes, including a class 4 felony for use or possession of dangerous drugs and class 6 felonies for marijuana violation, drug paraphernalia, and unlawful use of means of transportation.  (Ex. 15, 8/24/10 Investigative Report Case # 2010-0893, p. 2).

2.  On July 3, 2010, while Seawright was located in the Stiner Unit Dorm 2, D-Run ASPC-Lewis, he was savagely stabbed and beaten by fellow inmate(s) between the hours of 7:22 a.m. and 7:56 a.m.  (See Defendant's Motion for Summary Judgment "DMSJ" p. 8 lines 21-25).

3.  Seawright was first discovered by Correctional Officer Edna Jackson-Bey at 7:56 a.m. (See Defendants' Separate Statement of Facts "DSSF") at 94).

4.   On July 7, 2010 Seawright died as a result of injuries sustained from the stabbing / assault.  Thus, Seawright was murdered.

5.   The Stiner unit has two separate yards, the "Red" and "Blue" yard.  Six separate buildings (also called "dormitories") are located at Stiner.  Dorms 1, 2, and 3 are located in the "Blue Yard" and are completely separated by a fence from the "Red Yard."  Dorms 4, 5, and 6 are located in the "Red Yard." Each dormitory[2] houses 184 inmates.  (DSSF ¶ 8).

6.   Within each dormitory, there are separate "runs" (also known as "pods") that are lettered A through F.  (DSSF ¶ 9).

7.   These runs contain the bunks and living area for approximately 35-40 inmates.  (DSSF ¶ 10).

8.   Defendant Clayton Thompson was the Sergeant in charge of the Stiner unit on July 3, 2010.  (DSSF ¶ 62).

9.   Defendants Edna Jackson-Bey ("Jackson-Bey") and Jennifer Ann Blondin ("Blondin") were the only two correctional officers covering the Dormitories in the Blue Yard when Seawright was assaulted.   (DSSF ¶ 72).

10. A July 9, 2010 Information Report prepared by a correctional officer in the Stiner Unit is very telling regarding the dangerous conditions at Stiner prior to Seawright's murder.   (Ex. 24, 7/9/2010 Information Report).  This report provides:

> On the above date … while seeing inmates in Dorm 6 I had several inmates approach me complaining about **the unit always being short of staff and locked down**.  I advised the inmates that it was their own fault, and that **staff are constantly being sent out to cover medical transports because of inmates assaulting other inmates.**

(Ex. 24, 7/9/2010 Information Report) (emphasis added).

---

[2] The dormitories are referred to as buildings or H/U's meaning "housing units."  Thus, Dorm 2 can also be referred to as H/U 2.

11. On July 3, 2010, the Stiner unit should have had a staff of 24 individuals on site. (Exhibit 1, ASPC-Lewis Staffing Numbers; Ex. 2, Clayton Thompson Depo. p. 84, lines 10-25).

12. However, merely 11 correctional officers (less than 50%) were working at Stiner the morning when Seawright was assaulted.  (Exhibit 1, ASPC-Lewis Staffing Numbers; Ex. 2, Clayton Thompson Depo. p. 85 lines 1-25; p. 86 lines 1-8).

13. Stiner was down or missing 13 staff members that day. (Exhibit 1, ASPC-Lewis Staffing Numbers; Ex. 2, Thompson Depo. p. 84 lines 21-25; p. 85 line 1).

14. Sergeant Thompson stated in his deposition that "it was a concern" that he was short-staffed that day.  (Ex. 2, Thompson Depo. p. 45 lines 11-14).

15. The protocol was for Sergeant Thompson to call Deputy Warden McCarville if there were less than 14 staff members present to work at the Stiner Unit.  (Ex. 2, Thompson Depo. p. 31, lines 1-13).

16. Thompson tried to call McCarville one time that morning between 6:30 and 7:00 a.m. but McCarville did not answer the phone.  (Ex. 2, Thompson Depo. p. 32, lines 2-6; p. 34 lines 11-21).

17. There is no evidence that Thompson tried to call the main warden or another deputy warden about the severe staffing problem since he could not get ahold of McCarville, the deputy warden.

18. Stiner policy is for two correctional officers, a "Dorm Officer" and a "Floor Officer," to be assigned to each dormitory.  (Exhibit 3, Stiner Post Order, p. 9, policy 054.14).

19. This policy states that "[t]he Dorm Officer Post must be manned at all times."  (Exhibit 3, Stiner Post Order, p. 9, policy 054.14).

20. The policy does permit a Dorm Officer to assume the duties of a Floor Officer and thus to be responsible for both positions—this is called collapsing a "post."  (Exhibit 3, Stiner Post Order, p. 9, policy 054.14; ).

21. Collapsing the Floor Officer post, however, still results in each dormitory or housing unit being "manned at all times" because there is always a Dorm Officer present in the unit. (Ex. 4, Jackson-Bey Depo. p. 51 lines 20-25; p. 52 lines 1-24).

22. Defendant Thompson testified that the regulation regarding the amount of staff working in each dorm is that there is to be a person posted and another making two security checks per hour.  (Exhibit 2, Thompson Depo. p. 47 lines 7-13).

23. The morning of Seawright's assault, it is undisputed that instead of the six requisite correctional officers working in the Blue Yard (a Dorm Officer and a Floor Officer for each Dorm), there were merely two correctional officers (Jackson-Bey and Blondin) covering the three dormitories in the Blue Yard.  (Clayton Thompson Depo. p. 88 lines 1-12; See Defendants' Separate Statement of Facts ("DSSOF") Exhibit B, Declaration of Keith Smith, ¶ 24).

24. Obviously, this means that on July 3, 2010, one dormitory in the Blue Yard was without any supervision at any given time. (Ex. 2, Thompson Depo. p. 100 lines 18-25, p. 101 lines 1-8; Exhibit 4, Jackson-Bey Depo. pp.97 lines 21-25).

25. Thus, Seawright was assaulted on a day when two women were in charge of the safety and security of approximately 550 male inmates living in three separate dormitories that each housed six runs.[3] (Ex. 2, Thompson Depo. p. 88 lines 3-12).

26. Jackson Bey's deposition testimony is very revealing as to the precarious nature of that day:

> Q.      So you were required to do 16 [security] checks[4], correct?

---

[3] The three buildings would share a total of 18 pods where inmates had their living areas and bunks.

|   |   |   |
|---|---|---|
| A. | Correct. |
| Q. | And how many did you do? |
| A. | Six |
| Q. | And why was that? |
| A. | **It wasn't a normal day.** |
| Q. | Okay. And it wasn't a normal day because you were understaffed? |
| A. | Correct. |

….

Q.      Tell me what was different about that day.

A.      Because we were short staffed.

….

Q.      You believe that the checks were not made because you were short staffed that day?

A.      Correct.

…

Q.      It was something out of the ordinary in your mind that day for back in 2010?

A.      Yes.

Q.      And what made it out of the ordinary?

A.      **Because I had never in my career experienced a unit running under those circumstances.**

Q.      What circumstances?

A.      **Short staffed that way where a building was collapsed with no officer**.

(Exhibit 4, Jackson-Bey Depo. pp.96-98).

27. Jackson-Bey stated numerous times in her deposition that Stiner was short-staffed the day of the assault on Seawright and that it was not a normal day. (Ex. 4, Jackson-Bey Depo. pp. 50, 96-98).

28. Thompson stated that the day of the Seawright assault, he had "collapsed" not just some posts (i.e., having the Dorm officer assume the duties of the Floor Officer); but he collapsed the entire housing unit for Dorm 3.  (Ex. 2, Thompson Depo. p. 63 lines 1-19;  p. 88 lines 1-12; Ex. 15, p. 3 "At approximately [0710 hours], Sgt. Clayton Thompson advised [Blondin] she was now assigned to cover dorm two and three."; Ex. 5, Blondin Depo. p. 34 lines 14-22 ).  Thompson explained "collapsing a unit" as follows:

Q.      Now, explain to me as though I have never heard the term collapsing units at Lewis prison; what does that mean?

---

[4]Jackson-Bey was referring to the security checks in Dorm 1 – where she was assigned that day.

**A.      We secure the building, and the officer goes to what they're assigned to go do.  So whatever the assignment could be.**

Q.      What does collapsing the unit mean?

**A.      Where the officer leaves the building and other officers do the two security checks an hour. So all doors and everything are secured, and security checks are being conducted.**

[ ]

Q.      The person that is assigned to the unit makes two security checks an hour, how is that collapsing the unit?

A.      <u>**Because there's no staff actually posted inside the building.**</u>

(Exhibit 2, Thompson Depo. p. 46 lines 10-25, p. 47, lines 1-11) (emphasis added). *See also*,

(Ex. 4, Jackson-Bey Depo. p. 51 lines 20-25, p. 52 lines 1-24 explaining the difference between

collapsing a "post" and collapsing an entire building).

29. Thompson stated that he collapsed Building 3 that day which means that Building 3 had

no assigned officer.  (Exhibit 2, Thompson Depo. p. 79 lines 17-22).

30. Thus, Building 3 was an "empty" building without an assigned officer and Blondin and

Jackson-Bey had to juggle their responsibilities between the three buildings.  (Exhibit 2,

Thompson Depo. p. 63 lines 4-25).

31. In order to assist with Dorm 3, at various times Bey and Blondin had to necessarily leave

their assigned dorms unattended. (Exhibit 4, Jackson-Bey Depo. p. 61, lines 5-7).  (Exhibit 5,

Blondin Depo. p. 74 lines 18-25; p. 75 lines 1-5).

32. Thompson alleged that "collapsing" an entire unit was within regulation. (Exhibit 2,

Thompson Depo. p. 47 lines 12-13).

33. However, there is no regulation permitting that an entire building to be unattended.  The

policy states that the Dorm Officer post may not be "collapsed" and that that post must be

"manned" at all times.  (Ex. 2, Thompson Depo. p. 47 lines 14-17).

34. In addition, the "Post Collapse Chart" for Stiner is contrary to Stiner policy because it

permits for a Dorm Control Officer post to be collapsed and for both the Dorm Officer and Floor

Officer of the same Dormitory to be collapsed once staff shortages reach a certain level which leaves a dormitory without a C.O. "manning" the building at all times.  (Ex. 3 Stiner Post Order filed under seal as Attachment 2 to Exhibit C of DSSF and Ex. 23)

35. When Seawright was assaulted inside of Dorm 2, there were no correctional officers or staff members inside Dorm 2.  (Ex. 15, 8/24/10 Investigative Report # 2010-0893, p. 3).

36. Jackson-Bey said that there was no officer physically present in Dorm 2 between the hours of 7:22 and 7:56 am.  (Ex. 4, Jackson-Bey Depo. p. 57, lines 7-15).

37. Defendant Jackson-Bey was asked in her deposition: "Should there have been a CO [correctional officer] in Dorm 2 ensuring all inmates returned to their assigned bed spaces between 7:22 and 7:56?" Answer: "Yes."  Q: "And was there?" A: "No."  Q. "Do you think that is why this incident occurred?" A: "I don't know." (Ex. 4, Jackson-Bey Deposition p. 56 lines 7-17).

38. The Investigative Report for this incident prepared  by ADOC specific provides: "Note: Both Officer Jackson-Bey and Blondin were outside of HU 2 at the time Seawright was assaulted; and there was not an officer in HU 2 ensuring the inmates returned to their assigned bed spaces." (Ex. 15, 8/24/10 Investigative Report #2010-0893, p. 3).

39. This report also states that Sergeant Clayton Thompson said that "CO II Blondin and CO II Jackson-Bey were not in HU 2 and would not have been able to observe Seawright being assaulted.  Sgt. Thompson added if an officer was in the building or control room there would be an improved chance of seeing Seawright being assaulted." (Ex. 15, 8/24/10 Investigative Report #2010-0893, p. 5).

40. Blondin admitted that if the dorms had not been collapsed that day, somebody would have been in Dorm 2 at all times.  (Ex. 5, Blondin Depo. p. 69 lines 22-24).

41. Blondin was asked in her deposition: "Is it common to leave a dorm unattended for more than a half an hour with no CO on the floor at all?" Answer: "No." (Ex. 5, Blondin Depo. p. 59 lines 4-8).

42. When Blondin was asked whether Dorm 2 was left unattended from 7:22 to 7:56 a.m., she responded "No," but when asked who was in Dorm 2 she responded: "Bey, Lee, Bey. I gave the keys to her, so I don't know what she did or anything."  (Ex. 5, Blondin Depo. p. 60 lines 5-15.)

43. Blondin then admitted she was assuming that Jackson-Bey was in Dorm 2 and had no actual knowledge of that fact.  (Ex. 5, Blondin Depo. p. 60 lines 5-15).

44. Jackson-Bey told ADOC investigators that "with posts being regularly collapsed and one officer assigned to more than one building it is normal for a dorm to not have an officer in the pod for up to 30 minutes and sometimes longer."  (Ex. 15, 8/24/10 Investigative Report #2010-0893, p. 6).

45. It is a rarity to see the collapsing of a unit.  (Ex. 2, Thompson Depo. p. 48).

46. In addition,  since the Seawright murder, there has not been any collapsing of units because of a subsequent directive that all buildings will have a control room officer and a floor officer and the floor officer does not leave the building.  (Ex. 2, Thompson Depo. p. 49, lines 23-25, p. 50, lines 1-5; Ex. 4, Jackson-Bey Depo. p. 51 lines 18-23; p. 52 lines 10 "Now there's always an officer in the building.").

47. Interestingly, ADOC policy states that the pod doors are to remain open from 0600 and 2030 hours (6:00 a.m. to 8:30 p.m.) (Exhibit 3, Stiner Post Order, bottom of p. 13 1.3.1 "All run doors in the dormitory shall remain open between the hours of 0600 and 2030 hours).

48. The Declaration of Keith Smith to DSSOF avers that the pod doors are to remain open from 6 a.m. to 8:30 p.m. (DSSOF Ex. B ¶ 7).

49. However, the deposition testimony and documentation in this case shows that Officers Jackson-Bey and Blondin were leaving and locking up pod doors and entire dormitories that day. (Ex. 18, 7/3/10 Use of Force / Incident Management Report by Jackson-Bey stating: "I was complete with securing all the pod doors in H/U 2 …."; Ex. 4 Jackson-Bey Depo. pp. 33 lines 1-4; 61 lines 5-21, 59 lines 11-14; Ex. 5, Blondin Depo. p. 74, lines 18-25, p. 75 lines 1-5, p. 72 lines 14-20; Ex. 24).

50. The ADOC policy is that the time to conduct the two security checks per hour begins running at the top of each hour (i.e., from 6:00 to 7:00 am. there must be two security checks; from 7:00 a.m. to 8:00 a.m. there must be two checks, and so on) (Ex. 4, Jackson-Bey Deposition p. 85, lines 1-6; lines 17-19).

51. Officer Blondin testified in her deposition that the hour starts for doing the two required security checks "every clock hour."  When asked: "So 6:00 a.m., 7:00 a.m., 8:00 a.m. and so on, correct, two security checks per hour?" A: "Correct."  (Ex. 5, Blondin Deposition p. 41, lines 1-15).

52. Jackson-Bey further testified that if a person comes late to work, the time to conduct the two security checks per hour begins running "when the officer arrives on post." (Jackson-Bey Deposition p. 86, lines 1-23).

53. Officer Blondin was assigned to be the Dorm Officer for Dorm 2 the day of the Seawright assault.  (Exhibit 5, Blondin Depo. p. 25, lines 5-9).

54. Blondin said that she was solely responsible for inmate security welfare checks in Dorm 2 on July 3, 2010 from the time her shift started at 6:00 a.m. until 756 hours, when ICS was initiated.  (Ex. 5, Blondin Depo. p. 69 lines 12-18).

55. It is clear from Blondin's deposition testimony and log notes that she arrived on post at 6:00 a.m.  (Exhibit 6, 7/3/10 Correctional Service Log for Dorm 2 by Officer Blondin; Blondin Deposition p. 41 lines 1-3).

56. This means that Blondin was required to do two security checks between 6:00 a.m. to 7:00 a.m.; between 7:00 a.m. to 8:00 a.m. and so on throughout her shift. (See citations in ¶ 51).

57. Seawright was assaulted between 7:22 a.m. and 7:56 a.m.  (See Defendants' Motion for Summary Judgment, p. 8 lines 20-24).  If another security check had been performed during this hour, his life likely would have been spared.

58. While Blondin performed the two required security checks for Dorm 2 between 6:00 a.m. and 7:00 a.m. (specifically at 6:30 a.m. and 6:59 a.m.), there were never two security checks done between 7:00 a.m. and 8:00 a.m.  (Blondin Depo. p. 40, lines 1-11).

59. At 7:22 a.m., Blondin performed a security check in Dorm 2.  (Blondin Depo. p. 44, lines 22-24).

60. However, no second security check was done that hour.  (Blondin Depo. p. 56 lines 18-24; p. 92, lines 11-16).

61. Blondin testified that after the 7:22 a.m. security check in Dorm 2, the next one that was performed in Dorm 2 was at 9:19 a.m. (0919 hours). (Blondin Depo. p. 56 lines 18-24; p. 92, lines 11-16). Jackson-Bey testified: "I could not do two security checks per hour in Dorm 1 because Sergeant Thompson advised me to conduct security checks in Dorm 3 and Dorm 1 and 3

don't sit right next door to each other.  I have to walk a distance from Dorm 1 and 3." (Ex. 4, Jackson-Bey deposition p. 91-92).

62. Blondin's log notes from that day also show the same thing; namely, that only one security check was done between 7:00 a.m. and 8:00 a.m. which was the 7:22 a.m. security check.  (Ex. 6, 7/3/10 Correctional Service Log for Dorm 2 by Officer Blondin).

63. Blondin testified that she assumed Jackson-Bey would do the next security check in Dorm 2 because she gave Jackson-Bey the keys to Dorm 2.  (Blondin Depo. p. 92, lines 17-22).

64. Jackson-Bey testified that she did not do any security checks in Dorm 2 that day. (Jackson-Bey Depo. p. 36 lines 1-2).

65. Jackson-Bey further testified that she did not know if two checks were made per hour in Dorm 2 because she was not assigned to Dorm 2.  (Ex. 4, Jackson-Bey Depo. p. 34, lines 14-16).

66. Jackson-Bey did not do a security check inside Dorm 2 because Blondin had told her that a security check had been done and everything was fine. (Ex. 4, Jackson-Bey Depo. p. 39, lines 16-25; p. 40, lines 1-21; p. 41, lines 3-14).

67. Jackson-Bey testified that she was outside of Dorm 2 between 7:22 and 7:56 a.m. – a full 34 minutes. (Depo. Jackson-Bey p. 48 lines 5-7).

68. Pursuant to an August 4, 2010 Information Report, an inmate came forward to COIII Osborne with information about Dana Seawright's murder.  The information from this inmate reveals that the assailants had a significant amount of unsupervised time to assault Seawright. (Exhibit 8, August 4, 2010 Information Report).

69. Pursuant to this report, Seawright's attackers got to him right when he returned from chow. They had time to viciously and repeatedly punch, kick, stomp, and stab Seawright in D-run.  Then they had time to leave Seawright bleeding on the floor and then return to the D-run

and move Seawright to his bunk!  Other inmates had time to mop up blood, grab his TV, and clean things up.  (Ex. 8).

70. Finally, in a 7/3/2010 Report from St. Joseph's Hospital and Medical Center, Dr. James A. Mankin reports that "[I]t is felt that he [Seawright] was not seen for approximately 45 minutes after the assault and was found down."  (Ex. 16, 7/3/2010 Report from St. Joseph's Hospital).

71. Seawright was a homosexual and had been known to engage in homosexual activities with other inmates.  According to page 4 of an Investigations Report by ADOC Office of the Inspector General by Investigator Robert Williams, on March 27, 2010, Seawright (an African-American) had engaged in homosexual relations with another inmate, George Mendez, who was Mexican-American ("Inmate A").  (Ex. 9, Investigations Report, p. 4).

72. Mendez was beaten by fellow Mexican American inmates for having a homosexual relationship outside of his own race and Seawright was given a warning by the Black inmate population.  The case number for this assault is CIU Case # 2010-100066.[5]  (Ex. 9, Investigations Report, p. 4).

73. A July 8, 2010 Information Report contains information about Seawright's assault from a "confidential informant."  This informant stated that Seawright was assaulted because he had been "caught" engaging in oral sex with an inmate for the second time.  The informant said that the first time was with Mendez and that Mendez was currently in the hospital as a result of injuries from the assault.  (Ex. 13, 7/8/10 Information Report).

74. Up until July 2, 2010, Seawright was housed in Stiner Dorm 2 F-Pod.  On July 2, 2010, Seawright was moved to the D-pod in Dorm 2.  Issues of fact exist regarding why Seawright was moved to D-pod the day before the assault.  Sergeant Thompson testified that Seawright was

---

[5] Defendants have refused to provide this report to Plaintiffs.

moved to the D-pod because of a scuffle he had had with another inmate in the Building 2 F-pod. (Ex. 2, Thompson Depo. p. 40 lines 22-25; p. 41 lines 1-11).

75. However, a July 8, 2010 "Information Report" by Officer Diaz states that she moved Seawright on July 2, 2010 to make room for a new arrival and to allow Seawright to be with his "own race." (Ex. 10, 7/8/10 Information Report).  This report was prepared on July 8, 2010, days after the assault and after Seawright <u>died</u>.

76. There is significant evidence in addition to that of the July 8, 2010 Information Report (Ex. 13) that Seawright was murdered because he was homosexual.

77. In the following excerpts from an "Investigations Report" prepared by Investigator Robert Williams of the ADOC Office of the Inspector General show that the eyewitness inmates all agree that Seawright was assaulted for homosexual behavior:

- SSU staff provided a briefing of events and information gathered through the use of an informant.  The informant (who had proved reliable in the past) told SSU that Seawright had been assaulted because Seawright had been involved in a homosexual relationship with inmate Hamilton that had soured.  Hamilton informed the West Side City Crips of their homosexual relationship.  Seawright was told by the West Side City members to "handle" / assault Hamilton for talking about him.  This resulted in the fight of July 2, 2010 in the Dorm 2 F-pod between Seawright and Hamilton.  During this fight, a mirror was broken in the bathroom area of F pod.  Members of the West Side City Crips did not believe that the assault on Hamilton was harsh enough and then carried out the assault on Seawright.

- Investigator Williams interviewed the members of the West Side City Crips in the Blue Yard.  One inmate, Hunter, was very nervous, was shaky, and would not make eye contact.  Hunter did not provide any information and was placed in detention.  After Hunter was placed in detention he told correctional staff that Seawright inmate Hamilton had been involved in a homosexual relationship which went south, causing a fight between Seawright and Hamilton on July 2, 2010.  The following day on July 3, 2010 Hamilton attacked Seawright causing his injuries.

- Hamilton (who had a relationship with Seawright) was interviewed.  He admitted to the relationship and admitted to passing on the information concerning his relationship with Seawright to an individual but would not provide the name.  Hamilton was placed in detention. He stated he had nothing to do with the assault on Seawright and would not provide any information as to who did.

- On August 4, 2010, Investigator Williams spoke with inmate [redacted] who had approached correctional staff about the Seawright assault.  This inmate told Williams that he had seen the assault on Seawright by three African-American inmates.  [Redacted] told Williams he had witnesses inmate known as "Train"give the order to assault Seawright .  [Redacted] said he could not positively identify the attackers.  (See also Ex. 8, 8/4/10 Information Report).

- On September 3, 2010, Williams interviewed another inmate named Zapata. Zapata asked for protection from the general population inmates and asked to speak to investigations in reference to the Seawright case.  This inmate told Williams the identity of the person who had ordered the assault on Seawright.  Specifically, the report states:

> According to Zapata, inmate Hamilton approached Seawright in the dining hall while he was sitting with other West Side City Crip members to include "Train" and asked Seawright why he was disrespecting him.  Train then asked Seawright if he was going to sit with a "fag."  Seawright and Hamilton then exchanged words, when Hamilton made a statement against Seawright telling "Train" the two were currently involved in a homosexual relationship. This, according to Zapata caused the assault on Seawright.  Zapata said he was sitting in the vicinity of "Train" when this exchange took place.

(Exhibit 9, Investigations Report).

78. Sgt. Thompson testified that he found out that Seawright had been moved to D-pod from F-pod because of this July 2, 2010 fight and that the inmate with whom he had fought had been moved to "the other side of the yard." (Ex. 2, Thompson Depo. p. 40 lines 16-25, p. 41 lines 1-11).

79. Tellingly, Sgt. Thompson explained the reason from Seawright's move to D-pod after being asked: "Did you know whether he was involved in any relationship with any other prisoner at any time?" (Ex. 2 Thompson Depo. p. 40 lines 16-25, p. 41 lines 1-11).  Reading between the lines it logically follows that Thompson knew about the homosexual nature of the relationship that was a cause of the July 2nd fight.  Defendants knew or should have known that Seawright's homosexual partner had been assaulted in March of 2010 and was still hospitalized from the assault in July of 2010. (Ex. 13).

24

80. Significantly, inmates on July 9, 2010 exlained to CO Killman what had happened to Seawright as follows:

> A couple of inmates informed me that the inmate that was stabbed in Dorm 2 was uncalled for. They stated that the issue was because the inmate had admitted that he was homosexual, and was messing around with another race. I was then told that the "brothers" (black inmates) sent someone from the red yard over to handle the inmate (Seawright #195344), but instead got beat up. When he went back to the red yard beat up it was decided that there would be another attempt and this time they went four (4) deep with a weapon.

(Ex. 24 7/9/2010 Information Report).

81. In addition, Seawright was known by Jackson-Bey (and likely other CO's) because he spoke with her. (Ex. 4, Jackson-Bey Depo. p. 21 lines 2-24). Jackson-Bey described him as a "social butterfly" who was "always visible." (Ex. 4, Jackson-Bey Depo. p. 21 lines 2-24).

82. ADOC was told by eyewitness inmates the name and identity of the person who ordered the assault on Seawright, namely "Train." (Ex. 8, 8/4/10 Information Report; Ex. 9, Investigations Report). "Train" has never been charged and convicted for doing so.

83. ADOC took photos of the crime scene which include photos of blood-stained orange shirts and pants, bloody shoe prints, the bathroom/shower area with clothing on block wall; a wet mop in toilet area, and photos of inmate Hamilton with significant scratch marks and bruises all over his eye, neck, torso, and upper back. (Exhibit 11, Investigative Photographs of Crime Scene).

84. These photos show visibly fresh scratches and bruising on inmate Hamilton, yet Hamilton was never arrested and charged with Seawright's murder. (Ex. 11, photos of Hamilton photo #'s DSC00480 through DSC00488).

85. The Evidence Processing Report lists those items taken into evidence.  (Ex. 12, Investigative Photographs, Evidence Processing).

86. Video was taken of the crime scene, but apparently that video has been lost.  (Ex. 9, p. 5).

87. No arrests or convictions have ever been made for Seawright's murder. (Ex. 17).

88. In a July 8, 2010 Information Report detailing information given to ADOC from a confidential informant, it is reported that "CIU Williams stated he did not care who my source was and he **did not want any names** but he wanted the information included in the report."  (Ex. 13, 7/8/10 Information Report).  The lead investigator for the crime did not even want to know the name of the informant who just provided ADOC with a detailed account of why Seawright was murdered and how it happened!

89. Officer Williams also received a two reports dated 7/03/10 which provides the names of two inmates taken into detention as possible suspects of the Seawright assault, Hamilton and Hunter, yet Williams still did not obtain an arrest and closed the case.  (Ex. 14, 7/3/10 Information Reports; Ex. 16, 2/9/11 Criminal Investigative Report).

90. On November 10, 2010 the President and Executive Director of the Arizona Correctional Peace Officers Association ("ACPOA") wrote a letter to Jan Brewer, Governor of Arizona, on behalf of the association that represents all members of the Arizona Department of Corrections (including correctional officers, officer III's, sergeants, lieutenants, captains, nurses, majors, and non-uniform staff).  This letter states that for the "past year and a half" there have been serious and dangerous conditions within ADOC due to Director Charles Ryan's (Director of ADOC) poor leadership.  The letter states that within the ADOC administration there is a "well-known pattern of obstructing the disclosure of hazards in time to prevent accidents, injury, illness, and deaths.  Tragically, in these instances, danger is not 'imminent' – it is past, and too late to

respond."  The letter also warns that ADOC administration orders employees to falsity

documents. (Ex. 17, 11/10/10 Letter to Jan Brewer from ACPOA).

91. While nothing came from this letter other than negative repercussions to the ACPOA, it

is clear that employees in ADOC recognized that there were problems in the system that had led

to injury and deaths over the past year and a half (during the time Seawright died) that were

serious enough to alert the governor.  (Ex. 17, 11/10/10 Letter to Jan Brewer from ACPOA;

Exhibit 24).

92.  Jackson-Bey was the first ADOC  employee to learn that Seawright had been assaulted.

(Ex. 18, 7/3/2010 Use of Force / Incident Management Report by Jackson-Bey).

93. After locking down Dorm 2, Jackson-Bey heard a banging on a window in D-pod and

went and opened the door to D-Pod.  (Ex. 18).

94. Two inmates informed her that Seawright needed medical attention.  (Ex. 18).

95. Jackson-Bey found Seawright on his bunk face down and describes what she saw as

follows:

> As I got closer to him I could see blood running down the side of
> his bed.  I could see blood on his right arm and he was laying on
> his left arm on his stomach.  I walked around to bed 9 so I could
> see I/M Seawright from the side and he was bleeding from his face
> and it appeared that he had vomited at some point.  I then activated
> the Incident Command System and called for a supervisor and Sgt.
> Thompson arrived on site and assumed command as incident
> commander and request CIU, SSU and on duty officer also
> requested to have 911 called.

(Ex. 18).

96. Jackson-Bey stated in her deposition that she thought Seawright was conscious when she

found him.  (Ex. 4, Jackson-Bey Depo. p. 55 lines 23-24).

97. She said that she was calling out his name and every time she called his name he would respond with a moaning noise.  (Ex. 4, Jackson-Bey Depo. p. 56 lines 4-14).

98. She testified that he was making a sound as if he heard her but he could not respond to her.  (Ex. 4, Jackson-Bey Depo. p. 56 lines 3-5).

99. An ADOC executive report detailing the incident states that Sgt. Thompson reported that "At the time of this report Seawright was breathing on his own and was *conscious*."  (Ex. 22 Significant Incident Report and Executive Report) (emphasis added).

100.      The Stiner Post Order policy is that staff shall render aid within three (3) minutes of becoming aware that an inmate is in a state of medical emergency.  (Ex. 3 Stiner Post Order filed under seal as Attachment 2 to Exhibit C of DSSF, p. 3 Policy 054.02 subsection 1.1).

101.      Despite this policy, the undisputed facts are that Jackson-Bey did not render any medical assistance to Seawright.  Even though Seawright was found at 7:56 a.m., no medical aid was rendered to him until approximately 8:04 which is eight (8) minutes after Defendants became aware that Seawright was in a medical emergency.  (Ex. 20 7/04/2010 Use of Force / Incident Management Report by COII Hartley; Ex. 21 7/3/2010 Use of Force / Incident Report by Sergeant Thompson).

102.      The medical aid rendered was to apply pressure to the stab wounds.  (Ex. 20; Ex. 21).

103.      Even though Seawright was airlifted to the hospital, he did not arrive there until 10:00 a.m..  (Ex. 16, 7/3/2010 Report from St. Joseph's Hospital, p. 2, Showing "Admit Time" is 10:00).

. . .

. . .

Respectfully submitted this 9th day of May, 2013.


GILLESPIE, SHIELDS & DURRANT


s/DAN M. DURRANT
Dan M. Durrant
Attorneys for Plaintiff


## CERTIFICATE OF FILING

I hereby certify that, on May 9, 2013, I electronically transmitted the attached document to the U.S. District Court's Clerk office using the CM/ECF system for filing and transmittal of a Notice of Electronic Filing to attorneys of record on file for this case.

/s/  Jamie Chick
Jamie Chick