1    **WO**

2

3

4

5

6                        **UNITED STATES DISTRICT COURT**

7                             **DISTRICT OF ARIZONA**

8

9    Kini M. Seawright; *et al*.,

10                    Plaintiff,                     No. CV 11-1304-PHX-JAT

11

12   v.                                             **ORDER**

13

14   State of Arizona; *et al.*,

15                    Defendants.

16

17

18        Pending before the Court is Defendants'[1] Motion for Summary Judgment (the

19   "Motion").  (Doc. 83).  Defendants have filed a Separate Statement of Facts in Support of

20   the Motion.  (Doc. 84).  Plaintiffs have filed a Response (Doc. 97), a Controverting and

21   Separate Statement of Facts (Doc. 96), and a Supplemental Response (Doc. 116).

22   Defendants have also filed a Reply (Doc. 107).  Prior to filing their Response, Plaintiffs

23   filed a pending motion to exceed the page limit in their Response (Doc. 95).  The Court

24   will deny Plaintiffs' motion to exceed the page limitation as moot.  The parties appeared

25   before the Court for oral argument on Tuesday, August 27, 2013.  The Court now grants

26   Defendants' Motion for the following reasons.

27   _____

28   [1]       Defendants are the State of Arizona and Corrections Officers Edna Jackson-Bey,
     Clayton Thompson, and Jennifer Blondin.

I.      **BACKGROUND**

On November 24, 2009, Dana Seawright ("Dana") was committed to the Arizona Department of Corrections ("ADOC") to serve a twelve year sentence related to various felony charges. (Doc. 84 at 2). On July 2, 2010, Dana was housed with medium security inmates at the Stiner Unit in Blue Yard, Dorm 2, in Pod F, at Arizona State Prison Complex-Lewis (ASPC-Lewis). (*Id*.). Stiner Unit contains two yards—Blue and Red Yards. Each yard contains three dorms. Blue Yard contains Dorms 1-3. Each dorm contains six separate living areas called pods. Each pod houses between 35-40 inmates and has communal toilets, urinals, showers and sinks, as well as a common "Day Room" for inmate use. (*Id*. at 3). As medium security inmates, the inmates Dana was housed with inside Dorm 2 had demonstrated that they were not physical threats to each other and were, therefore, housed in dormitory-style housing. (*Id*.). Generally, inmates were free to move around within Blue Yard, the dorm, and pods without an officer escort. (*Id*.).

On July 2, 2010, Dana was involved in a fight with another inmate that Dana reportedly started. (Doc. 96 at 24 ¶ 78). On that day, Dana was moved from Pod F to Pod D in Dorm 2. (Doc. 84 at 4). On the morning of July 3, 2010, at some point between 7:22 and 7:56 a.m., Dana was beaten and stabbed by fellow inmates and left in his cell. (Doc. 96 at 11). Dana was assaulted by members of his own race because he was engaging in a homosexual relationship with an inmate of a different race. (*Id*. at 23-25).

At 7:56 a.m. Defendant Edna Jackson-Bey was called by other inmates to Dorm 2 and told she needed to call medical. (Doc. 84 at 14). Jackson-Bey found Dana in his bed lying face down and bleeding. She initiated the Incident Command System. (*Id*.). Jackson-Bey tried to communicate with Dana and all Dana would do was make moaning noises when she called his name. (Doc. 96-1 at 47). On July 7, 2010, Dana was removed from life support systems at St. Joseph's medical center in Phoenix and he died as a result of injuries sustained in the beating. (Doc. 97 at 4).

On the day Dana was assaulted, Stiner unit where Dana was housed was

understaffed with only 11 correctional officers on duty instead of the normal 24 correctional officers. Defendant Clayton Thompson was the sergeant in charge of the Stiner unit on July 3rd. (Doc. 96 at 13 ¶14). Normally there would have been six correctional officers working in the three dorms in Blue Yard—a Dorm Officer and Floor Officer for each dorm. (*Id*. at ¶23). Thompson was required by policy to call the Deputy Warden if there were less than 14 staff members present to work at the Stiner Unit—a call that Thompson made to the Deputy Warden between 6:30 and 7:00 a.m. that morning. (*Id*. at ¶¶15-16). The Deputy Warden did not answer the phone and Thompson was unable to communicate with the Deputy Warden about the situation. (*Id*.). After not being able to get ahold of the Deputy Warden, Thompson made the decision to "collapse" Dorm 3 in Blue Yard at 7:10 a.m. in accordance with established procedures because of being short staffed. (*Id*. at ¶28). Collapsing a post could be done when there was not enough staff to have a dedicated employee assigned to each post. (Doc. 84 at 5). After collapsing a post, an employee already assigned to another post would take on the additional assignment of covering the collapsed post. (*Id*.). As a result, after collapsing Dorm 3, two correctional officers—Defendants Jackson-Bey and Jennifer Blondin—were in charge of security checks at Dorms 1, 2, and 3 in Blue Yard, which housed approximately 550 inmates on the morning Dana was assaulted. (Doc. 96 at ¶¶9, 25). Specifically, following the collapse, Blondin was in charge of security checks at Dorms 2 and 3 and Jackson-Bey was in charge of security checks at Dorms 1 and 3.

On July 3rd, Blondin arrived on post at 6:00 a.m. (*Id*. at ¶55). Two security checks were required by policy to be conducted in Dorm 2 between 6:00 and 7:00 a.m. and two more security checks were required to be conducted between 7:00 and 8:00 a.m. (*Id*. at ¶56). Blondin knew that security checks needed to be conducted twice an hour and that the hour started on the clock hour. (*Id*. at ¶51). Blondin performed security checks at 6:30 and 6:59, and again at 7:22 a.m. (*Id*. at ¶58). At 7:10 a.m., after the collapse, Blondin became responsible for conducting security checks in Dorm 3 as well. (*Id*. at ¶28). After the security check at 7:22 in Dorm 2, Blondin left Dorm 2 to go to Dorm 3

and she gave Jackson-Bey the keys to Dorm 2 in order for Jackson-Bey to continue securing Dorm 2 inmates returning from the dining hall.  (*Id*. at ¶63).

Jackson-Bey was not responsible for security checks in Dorm 2 at any time on July 3rd.  (Doc. 84 at 14).  Blondin assumed Jackson-Bey would do the second security check in Dorm 2 between 7 and 8:00 a.m. and she assumed that Jackson-Bey was in Dorm 2 between 7:22 and 7:56 a.m.  (Doc. 96 at ¶¶ 43, 63).  Jackson-Bey did not know to do another security check because she did not know that two checks were made per hour in Dorm 2.  (*Id*. at ¶ 65).  When turning over the keys, Blondin told Jackson-Bey that Blondin had already done the 7:22 security check and that everything was fine.  (*Id*. at ¶ 66).  Jackson-Bey was outside Dorm 2 between 7:22 and 7:56 a.m.  (*Id*. at ¶67).

Plaintiffs are the Estate of Dana Seawright (the "Estate") and Kini Seawright. Kini Seawright is the mother of Dana.  Plaintiffs originally filed a complaint in this Court on June 30, 2011.  (Doc. 1).  On October 12, 2011, Plaintiffs filed a First Amended Complaint.  (Doc. 19).  On June 18, 2012, Plaintiffs filed a Second Amended Complaint. (Doc. 53).  Plaintiffs' Second Amended Complaint (the "Complaint") brought this action against various Defendants including, the State of Arizona, Charles L. Ryan, the Director of the ADOC, and individual Corrections Officers that were on duty at the Stiner Unit when Dana was assaulted.  (*Id*. at 1).  In the Complaint, Plaintiffs allege five counts against Defendants.  (*Id*. at 9-22).

On February 6, 2013, the Court entered an order granting in part and denying in part Defendants' motion to dismiss (Doc. 73).  As a result of that order, the claims remaining against Defendants include: Count One, the Estate's and Kini Seawright's claim for violation of Plaintiffs' rights under 42 U.S.C. § 1983 against Defendants Edna Jackson-Bey, Clayton Thompson, and Jennifer Blondin (collectively the "Officer Defendants"); Count Three, Kini Seawright's claim of negligence and/or gross negligence against the State of Arizona (the "State"); Count Four, both Plaintiffs' claims for violation of the Arizona Constitution "Article 2 section 2" (due process of law[2]) and

---

[2]     Article 2, section 2 of the Arizona Constitution does not address due process at all.

1   Article 2 section 15 (cruel and unusual punishment), against the State; and Count Five,

2   Kini Seawright's claim for wrongful death under Arizona Revised Statutes ("A.R.S.") §

3   12-611, et. seq. against the State.  *See* (Doc. 53; Doc. 73).

4   **II.   ANALYSIS**

5         Defendants have moved for summary judgment under Federal Rule of Civil

6   Procedure 56 on Plaintiffs' remaining claim against the Officer Defendants (i.e. Count

7   One), and on Plaintiffs' remaining claims against the State (i.e. Counts Three, Four, and

8   Five).  (Doc. 83 at 1).  Summary judgment is only appropriate when "the movant shows

9   that there is no genuine dispute as to any material fact and the movant is entitled to

10   judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A party asserting that a fact cannot

11   be or is genuinely disputed must support that assertion by . . . citing to particular parts of

12   materials in the record," or by "showing that materials cited do not establish the absence

13   or presence of a genuine dispute, or that an adverse party cannot produce admissible

14   evidence to support the fact."  *Id*. 56(c)(1)(A)&(B).  Thus, summary judgment is

15   mandated "against a party who fails to make a showing sufficient to establish the

16   existence of an element essential to that party's case, and on which that party will bear the

17   burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

18         Initially, the movant bears the burden of pointing out to the Court the basis for the

19   motion and the elements of the causes of action upon which the non-movant will be

20   unable to establish a genuine issue of material fact.  *Id*. at 323.  The burden then shifts to

21   the non-movant to establish the existence of material fact.  *Id*.  The non-movant "must do

22   more than simply show that there is some metaphysical doubt as to the material facts" by

23   "com[ing] forward with 'specific facts showing that there is a genuine issue for trial.'"

24   *Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 586–87 (1986) (quoting

25   Fed. R. Civ. P. 56(e) (1963) (amended 2010)).  In the summary judgment context, the

26   Court construes all disputed facts in the light most favorable to the non-moving party.

27   _____

28   This provision of the Arizona Constitution addresses "Political Power" and the "purpose of government."  Ariz. Const. art. 2, § 2.  Plaintiffs may have meant section 4, which does address due process.  *See* Ariz. Const. art. 2, § 4.

1  *Ellison v. Robertson*, 357 F.3d 1072, 1075 (9th Cir. 2004).

2    The mere existence of some alleged factual dispute between the parties will not

3  defeat an otherwise properly supported motion for summary judgment; the requirement is

4  that there be no genuine issue of material fact.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S.

5  242, 247-248 (1986).  A material fact is any factual issue that might affect the outcome of

6  the case under the governing substantive law.  *Id*. at 248.  A material fact is "genuine" if

7  the evidence is such that a reasonable jury could return a verdict for the non-moving party.

8  *Id*.

9    At the summary judgment stage, the trial judge's function is to determine whether

10  there is a genuine issue for trial.  There is no issue for trial unless there is sufficient

11  evidence favoring the non-moving party for a jury to return a verdict for that party.  *Id*. at

12  249-250.  If the evidence is merely colorable or is not significantly probative, the judge

13  may grant summary judgment.  *Id*.

14    **A.** **Count One**

15    First, the Officer Defendants have moved for summary judgment on Plaintiffs'

16  claim against them in Count One under 42 U.S.C. § 1983 ("section 1983").  (Doc. 83 at 4-

17  12).  The Officer Defendants have also moved for summary judgment on Count One due

18  to qualified immunity.  (*Id*. at 12-16).  The Court will address Plaintiffs' section 1983

19  claim first and then address Defendants' qualified immunity challenge.

20    **1.** **Plaintiffs' Section 1983 Claim**

21    Section 1983 is not a source of substantive rights on its own.  *Graham v. Connor*,

22  490 U.S. 386, 393 (1989).  Section 1983 "merely provides 'a method for vindicating

23  federal rights elsewhere conferred.'"  *Id*. at 394 (quoting *Baker v. McCollan*, 443 U.S.

24  137, 144, n. 3 (1979)).  "To make out a cause of action under section 1983, plaintiffs must

25  [show] that (1) the defendants acting under color of state law (2) deprived plaintiffs of

26  rights secured by the Constitution or federal statutes."  *Gibson v. United States*, 781 F.2d

27  1334, 1338 (9th Cir. 1986) (citing *Smith v. Cremins*, 308 F.2d 187, 190 (9th Cir. 1962)).

28  "The first inquiry in any § 1983 suit" is "to isolate the precise constitutional violation with

which [the defendant] is charged." *Baker*, 443 U.S. at 140.  Plaintiffs allege that the Officer Defendants violated Dana's federal rights against unreasonable seizures by use of excessive force under the Fourth Amendment to the United States Constitution and Dana's right to be free from cruel and unusual punishment under the Eighth Amendment.  (Doc. 53 at 9).

In the Order dismissing Plaintiffs' claims in part, the Court "dismiss[ed] Plaintiffs' Fourth Amendment claim in Count One for failure to state a claim upon which relief can be granted" because the Fourth Amendment protections against excessive force do not apply after conviction and the pending action arose after Dana's conviction.  (Doc. 73 at 6).  Consequently, only Plaintiffs' Eighth Amendment claim under section 1983 remains in Count One and the Court must determine if there is a genuine issue for trial over whether Dana's Eighth Amendment rights were violated by the Officer Defendants.

To survive Defendants' motion for summary judgment, the Court must determine if the undisputed facts show that there is sufficient evidence favoring Plaintiffs for a jury to find that (1) the Officer Defendants were acting under color of state law, and (2) that the Officer Defendants deprived Dana of rights secured by the Constitution or federal statutes.  *Gibson*, 781 F.2d at 1338; *see Anderson*, 477 U.S. at 249-50.  The undisputed facts show that the Officer Defendants were acting under color of state law as Correctional Officers assigned to the Stiner Unit at ASPC-Lewis.  (Doc. 84 at 8, 11, 13).  The Court must now determine if there is a genuine issue of fact over whether the Officer Defendants deprived Dana of his Constitutional rights guaranteed by the Eighth Amendment as Plaintiffs allege.

Plaintiffs claim that the Officer Defendants were deliberately indifferent to the health, safety, protection and medical needs of prisoners and that they permitted excessive and unnecessary force used maliciously for the purpose of causing harm in violation of the Eighth Amendment protection against cruel and unusual punishment. (Doc. 53 at 9).  "[T]he treatment a prisoner receives in prison and the conditions under which he is confined are subject to scrutiny under the Eighth Amendment." *Farmer v.*

*Brennan*, 511 U.S. 825, 832-33 (1994) (citing *Helling v. McKinney*, 509 U.S. 25, 31 (1993)).  The Eighth Amendment imposes "duties on [prison] officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.'"  *Id*. (quoting *Hudson v. Palmer*, 468 U.S. 517, 526–527 (1984)).  "In particular, as the lower courts have uniformly held, and as we have assumed, 'prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners.'"  *Id*. (quoting *Cortes–Quinones v. Jimenez–Nettleship*, 842 F.2d 556, 558 (1st Cir. 1988), cert. denied, 488 U.S. 823 (1988)).

> It is not, however, every injury suffered by one prisoner at the hands of another that translates into constitutional liability for prison officials responsible for the victim's safety.  Our cases have held that a prison official violates the Eighth Amendment only when two requirements are met.  First, the deprivation alleged must be, objectively, sufficiently serious, a prison official's act or omission must result in the denial of the minimal civilized measure of life's necessities.

*Id*. at 834 (internal quotations and citations omitted).

Accordingly, the evidence must first show that Dana was deprived of something "sufficiently serious."  *See Thomas v. Ponder*, 611 F.3d 1144, 1150 (9th Cir. 2010) (quoting *Farmer*, 511 U.S. at 834).  The undisputed facts clearly show Dana was killed by a savage attack at the hands of other inmates.  (Doc. 96 at 11-12 ¶¶ 2, 4).  The Court finds this more than qualifies as sufficiently serious.

> The second requirement follows from the principle that only the unnecessary and wanton infliction of pain implicates the Eighth Amendment.  To violate the Cruel and Unusual Punishments Clause, a prison official must have a sufficiently culpable state of mind.  In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety.

*Farmer*, 511 U.S. at 834 (internal quotations and citations omitted).  Thus, the Court must now determine if the Officer Defendants acted with a culpable state of mind.  This

state of mind is proven by showing the Officer Defendants were deliberately indifferent to Dana's health and safety.

"[D]eliberate indifference entails something more than mere negligence, the cases are also clear that it is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835. "[S]howing 'deliberate indifference,' involves a two part inquiry.  First, [Plaintiffs] must show that the prison officials were aware of a "substantial risk of serious harm" to an inmate's health or safety." *Thomas*, 611 F.3d at 1150 (quoting *Farmer*, 511 U.S. at 837). "This part of our inquiry may be satisfied if [Plaintiffs] show[ ] that the risk posed by the deprivation is obvious." *Id.* (citation omitted).  "The correct issue for consideration is [ ] whether the prison officials were subjectively aware of a 'serious *risk* of substantial harm.'" *Id.* at 1150 n. 5 (emphasis in original) (quoting *Farmer*, 511 U.S. at 837; citing *Helling v. McKinney*, 509 U.S. 25, 32 (1993) ("That the Eighth Amendment protects against future harm to inmates is not a novel proposition.")).  "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer*, 511 U.S. at 837.

Second, Plaintiffs must show that the prison officials acted unreasonably, or "show that the prison officials had no 'reasonable' justification for the deprivation, in spite of that risk." *Thomas*, 611 F.3d at 1150 (citing *Farmer*, 511 U.S. at 844 ("[P]rison officials who actually knew of a substantial risk to inmate health or safety may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted.").  "[P]rison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause." *Farmer*, 511 U.S. at 845.

Consequently, to determine if the Officer Defendants were deliberately indifferent the Court considers if there is a genuine issue of fact over whether the Officer Defendants were subjectively aware of the substantial risk of serious harm to Dana on the morning of July 3, 2010.  If there is enough evidence to establish this issue of fact, the Court will then determine if there is a triable question of fact regarding whether the Officer

Defendants had a reasonable justification for not acting to mitigate that risk.

### a. Awareness of a Substantial Risk of Serious Harm

In *Thomas*, the Ninth Circuit Court of Appeals focused on the first prong of the test for deliberate indifference and called it an "obviousness requirement." *Thomas*, 611 F.3d at 1151 (quoting *Farmer*, 511 U.S. at 842). "Whether a prison official had the requisite knowledge of a substantial risk is a question of fact subject to demonstration in the usual ways, including inference from circumstantial evidence and a fact finder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted). "[W]e measure what is 'obvious' in light of reason and the basic general knowledge that a prison official may be presumed to have obtained regarding the type of deprivation involved." *Thomas*, 611 F.3d at 1151 (quoting *Farmer*, 511 U.S. at 842). "[I]f a [claimant] presents evidence of very obvious and blatant circumstances indicating that the prison official knew a substantial risk of serious harm existed, then it is proper to infer that the official must have known of the risk." *Id.* at 1152 (citation omitted). Further, in order to survive Defendants' motion for summary judgment, Plaintiffs must show that each Officer Defendant, through their own individual actions, has violated the Eighth Amendment. *Ashcroft v. Iqbal*, 556 U.S. 662, 676 (2009) ("[A] plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

In this case, the Court finds that there is a question of fact regarding whether Defendants Thompson and Jackson-Bey were aware of a substantial risk of serious harm to Dana. Dana was housed in the Stiner Unit, Blue Yard, Dorm 2, Pod D on the morning he was assaulted, July 3rd. (Doc. 96 at ¶2). The undisputed facts show that the Stiner unit where Dana was housed was understaffed with only 11 correctional officers on duty on the day Dana was assaulted instead of the normal 24 correctional officers. There should have been six correctional officers working in the Blue Yard, which contained three dorms—a Dorm Officer and Floor Officer for each dorm. (*Id.* at ¶23). Policy allowed

for a minimum of three officers to be used to oversee the three dorms in Blue Yard.  (*Id*. at ¶20).   Yet on July 3rd there were only two correctional officers working the three dorms in the Blue Yard where Dana was housed in Dorm 2.  (*Id*. at ¶23).

Defendant Thompson, the sergeant in charge of the Stiner unit on July 3rd, testified in his deposition that "it was a concern" that he was short-staffed that day.  (*Id*. at ¶14). Further, policy required Thompson to call the Deputy Warden if there were less than 14 staff members present to work at the Stiner Unit—a call that Thompson made to the Deputy Warden between 6:30 and 7:00 a.m. that morning.  (*Id*. at ¶¶15-16).  However, the Deputy Warden did not answer the phone and no evidence has been presented that shows Thompson made any other calls.  (*Id*.).  Further, because of being short staffed, Thompson made the decision to "collapse" Dorm 3 at 7:10 on July 3rd.  (*Id*. at ¶28).  As a result, two correctional officers, Defendants Jackson-Bey and Blondin, were in charge of the safety and security of approximately 550 inmates living in the three dorms of Blue Yard on the morning Dana was assaulted.  (*Id*. at ¶¶9, 25).  This meant that at all times until another correctional officer could be used by Thompson, at least one dorm in Blue Yard would not have a correctional officer physically present in the building.  (*Id*. at ¶33).

The undisputed facts show that Thompson knew that his unit was understaffed, that he was concerned about the situation, and that the policies which Thompson followed were put in place because such a situation was deemed serious enough.  When looking at the facts in a light most favorable to the Plaintiffs, the Court finds that Plaintiff has presented enough evidence of obvious and blatant circumstances to create an issue of fact over whether Thompson knew a substantial risk of serious harm existed.  *See Thomas*, 611 F.3d at 1152; *Ellison*, 357 F.3d at 1075.

With regard to Defendant Jackson-Bey, she testified in her deposition that the day Dana was assaulted "[i]t wasn't a normal day" "[b]ecause we were short staffed" and that she "believed that the checks were not made because [she was] short staffed that day." (Doc. 96 at ¶26).  Further, Jackson-Bey testified that on the day Dana was assaulted that

1    in her mind the day was "out of the ordinary" "[b]ecause I had never in my career

2    experienced a unit running under those circumstances," "[s]hort staffed that way where a

3    building was collapsed with no officer." (*Id*.).   Jackson-Bey also testified that there

4    should have been a correctional officer in Dorm 2 ensuring all inmates returned to their

5    assigned bed spaces between 7:22 and 7:56 a.m. when Dana was assaulted, and that no

6    correctional officer was there at that time. (*Id*. at ¶37).  The Court finds this testimony is

7    also enough to show obvious and blatant circumstances that create an issue of fact over

8    whether Jackson-Bey knew that a substantial risk of serious harm existed on the morning

9    Dana was assaulted.

10           With regard to Defendant Blondin, at approximately 7:10 a.m. on July 3rd, she was

11   assigned to cover security checks for both Dorms 2 and 3. (*Id*. at ¶28).   Because she was

12   assigned to both Dorms 2 and 3, she was not in Dorm 2 when Dana was assaulted

13   between 7:22 and 7:56 a.m. (*Id*. at ¶35).   In her deposition testimony, Blondin testified

14   that if the dorms had not been collapsed on the morning of July 3rd, somebody would

15   have been in Dorm 2 when Dana was assaulted. (*Id*. at ¶40).   Blondin also testified that it

16   was not common to leave a dorm unattended for more than half an hour with no

17   correctional officer on the floor at all. (*Id*. at ¶41).   Blondin knew that security checks

18   were to be conducted twice an hour and that the hour started on the clock hour. (*Id*. at

19   ¶51).   Blondin arrived on post at 6:00 a.m. (*Id*. at 55).   Two security checks were

20   required to be conducted between 6:00 and 7:00 a.m. and two more security checks were

21   required to be conducted between 7:00 and 8:00 a.m. (*Id*. at ¶56).   Blondin performed

22   security checks at 6:30 and 6:59, and again at 7:22 a.m. (*Id*. at ¶58).   However, after the

23   security check at 7:22, Blondin left the building and testified that she assumed Jackson-

24   Bey would do the second security check in Dorm 2 between 7 and 8:00 a.m. because she

25   gave Jackson-Bey the keys to Dorm 2. (*Id*. at ¶63).   Further, Blondin assumed that

26   Jackson-Bey was in Dorm 2 between 7:22 and 7:56 a.m. (*Id*. at ¶43).

27           The Supreme Court in *Farmer* stated clearly that "Eighth Amendment liability

28   requires consciousness of a risk." *Farmer*, 511 U.S. at 840.   While Blondin knew she

had been assigned to cover both Dorm 2 and 3 as of 7:10 a.m. that morning, there is no evidence to suggest that she believed this situation caused a substantial risk of serious harm or that she knew Dorm 2 would be unstaffed for the 36 minutes following her security check at 7:22 a.m.  Any conclusion that she did know this is purely speculative given the evidence.  Accordingly, the Court finds that there are not enough facts to show obvious and blatant circumstances or to create a genuine issue of fact as to whether Defendant Blondin knew that a substantial risk of serious harm existed when she left Dorm 2 after conducting the security check at 7:22.  Therefore, Blondin could not be found to be deliberately indifferent and liable for violating Dana's Eighth Amendment right against cruel and unusual punishment.

### b.      Reasonableness of Officer Defendants' Response

Next, the Court must determine if there is enough evidence to create a triable issue of fact over whether the Officer Defendants "responded reasonably to the risk, even [though] the harm ultimately was not averted."  *Id*. at 842.

> A prison official's duty under the Eighth Amendment is to ensure reasonable safety, a standard that incorporates due regard for prison officials' unenviable task of keeping dangerous men in safe custody under humane conditions. Whether one puts it in terms of duty or deliberate indifference, prison officials who act reasonably cannot be found liable under the Cruel and Unusual Punishments Clause.

*Id*.

As explained in the previous section, Thompson was the sergeant in charge of Dorm 2 on the morning Dana was assaulted.  The undisputed facts show Thompson was concerned because he did not have enough staff members overseeing Blue Yard.  He was required to call the Deputy Warden due to the man power shortage that morning and he made that phone call.  However, no evidence shows Thompson took any further action to alleviate the risk at hand.  Thompson made the decision to "collapse" the entire housing unit in Dorm 3 which led to Dorm 2 not being manned when Dana was assaulted.  (Doc. 96

at ¶28).  Blondin testified that had the dorms not been collapsed, Dorm 2 would not have been unmanned when Dana was assaulted.  (*Id*. at ¶40).  While Thompson was left in a precarious position due to the staff shortage, the Court finds a question of fact exists as to whether Thompson responded reasonably to the risk.

Jackson-Bey knew Blondin had performed the last security check at 7:22 a.m. and testified that Blondin told her everything was fine.  (*Id*. at ¶66).  While Jackson-Bey was not assigned to Dorm 2, Blondin testified that she gave Jackson-Bey the keys to Dorm 2 after the 7:22 security check.  (*Id*. at ¶63).  Jackson-Bey testified that there should have been a correctional officer in Dorm 2 ensuring that all inmates returned to their assigned bed spaces between 7:22 and 7:56, yet she also testified that in spite of having received the keys to Dorm 2 from Blondin, she did not go inside Dorm 2 between 7:22 and 7:56.  (*Id*. at 67).  Given these facts, the Court finds a question of fact also exists as to whether Jackson-Bey responded reasonably to the risk.

### c.   Plaintiffs' Remedies Under their Section 1983 Claim

Having found that a question of fact exists over whether the remaining Officer Defendants acted with deliberate indifference, the Court turns to whether Plaintiffs would have any remedy for their section 1983 claim if a jury found in their favor.  As the Court explained in its previous order dismissing Plaintiffs' claims in part (Doc. 73), section 1983 merely creates a civil cause of action for any person whose federal rights have been deprived by a person acting under color of law.  The statute does not, however, specify the remedies available to such a person, nor does it address whether the cause of action survives the death of the injured person.  The remedies of a section 1983 claim and whether the cause of action survives the death of the decedent come from the laws of the forum state, as long as these laws are consistent with the laws of the United States and the policy underlying section 1983.  (*Id*. at 17) (quoting *Gotbaum v. City of Phx*., 617 F. Supp. 2d 878, 882 (D. Ariz. 2008)).

In this case, Dana Seawright has died.  Therefore, the Court must turn to the laws of Arizona to determine if any cause of action survives for Dana Seawright's Estate or

1   Dana Seawright's mother.  As the Court explained in its previous order, the only causes of

2   action that survive for Plaintiffs are a survival claim for the Estate and a wrongful death

3   claim for Kini Seawright.  (*Id*. at 16-17).

4                           **i.      Kini Seawright's Section 1983 Claim**

5          The Officer Defendants argue that Plaintiff Kini Seawright cannot bring a section

6   1983 claim against them seeking damages for "her" pain and suffering.  (Doc. 83 at 4-5).

7   The Officer Defendants acknowledge that the Court dismissed Kini Seawright's section

8   1983 claim seeking damages for her son's pre-death pain and suffering, but they contend

9   that Kini Seawright still could have a claim under section 1983 for her own pain and

10  suffering and they argue this claim should also be dismissed.  (*Id*.).  In spite of the Court's

11  order clearly dismissing Kini Seawright's section 1983 claim seeking damages for her

12  son's pre-death pain and suffering (*see* Doc. 73 at 13-18), Plaintiffs still argue this issue

13  (Doc. 97 at 19) and like Defendants, Plaintiffs also argue that she has a claim for "her

14  [own] pain and suffering in needlessly losing her son" (*id*. at 20).  The Court has already

15  thoroughly addressed half of Plaintiffs' argument and explained to the parties that no, Kini

16  Seawright does not have a section 1983 claim for the pre-death pain and suffering of her

17  son.  (Doc. 73 at 16-18).

18         With regard to a section 1983 claim for Kini Seawright's own pain and suffering,

19  the parties contend in their pleadings and at oral argument that she can bring such a claim

20  because the Ninth Circuit recognizes a right for parents to bring a section 1983 claim

21  "based upon the substantive due process right to family integrity and familial association,"

22  that "a parent has a 'fundamental liberty interest' in the companionship of his or her child,"

23  and to "amount to a violation of substantive due process . . . the harmful conduct must

24  'shock the conscience.'"  (Doc. 83 at 4-5) (quoting *Kelson v. City of Springfield*, 767 F.2d

25  651, 654-55 (9th Cir. 1985) and *Marsh v. Cnty. of San Diego*, 680 F.3d 1148, 1154 (9th

26  Cir. 2012)); (Doc. 97 at 19-20).  Defendants raised this argument in their Motion to

27  Dismiss and argued that the Officer Defendants' conduct did not shock the conscience and

28  that is why Kini Seawright cannot bring a section 1983 claim on her own behalf.  *See* (Doc.

63 at 13-14).  In the order granting Defendants' Motion to Dismiss, the Court explained that this argument completely misses the mark and is irrelevant to why Kini Seawright cannot seek damages for both her own suffering and Dana Seawright's pre-death pain and suffering.  (Doc. 73 at 16-18).  In spite of this, Defendants have raised this argument again in their Motion for Summary Judgment and at oral argument, arguing that Kini Seawright's own claim for pain and suffering is dependent on whether the Officer Defendants' conduct shocks the conscience.  *See* (Doc. 83 at 4-5).

The Court will endeavor to explain more thoroughly why the parties' argument— whether or not the Officer Defendants' conduct shocks the conscience—is irrelevant to Kini Seawright's 1983 claim.  Indeed, the Ninth Circuit Court of Appeals has recognized that "the parent-child relationship is constitutionally protected and that governmental interference with it gives rise to a section 1983 action for damages."  *Kelson*, 767 F.2d at 654 (citing *Morrison v. Jones*, 607 F.2d 1269, 1275 (9th Cir. 1979), *cert. denied*, 445 U.S. 962 (1980)).  However, as the Court of Appeals also explained and the parties appear to miss, this right is protected by the "Due Process Clause of the Fourteenth Amendment, the Equal Protection Clause of the Fourteenth Amendment, and the Ninth Amendment'."  *Id*. (quoting *Morrison*, 607 F.2d at 1275-76).

Plaintiffs have made no claims against the Officer Defendants under these Amendments to the Constitution.  As explained above, *see supra* Section II.A.1, section 1983 is not a source of substantive rights on its own, it "merely provides a method for vindicating federal rights elsewhere conferred."  *Graham*, 490 U.S. at 393 (quotation omitted).  The first inquiry in any section 1983 suit is to isolate the precise constitutional violation with which the defendant is *charged*.  *Baker*, 443 U.S. at 140 (emphasis added).  As further explained above in the same section, the only constitutional charge remaining in Count One is Plaintiffs' claim that the Officer Defendants violated the Eighth Amendment.  Further, Plaintiffs have never made claims against the Officer Defendants under the Fourteenth Amendment nor the Ninth Amendment.[3]  The Eighth Amendment does not give

---

[3]     In the Second Amended Complaint the only claim against the Officer Defendants

rise to a right to family integrity and familial association.  Consequently, Plaintiffs'
arguments for a section 1983 claim based on a right to family integrity and Defendants'
arguments against it are irrelevant to Plaintiffs' section 1983 claims in Count One against
the Officer Defendants.

Kini Seawright has a section 1983 claim based on the Officer Defendants' alleged
violation of Dana's Eighth Amendment rights.  As explained in the Court's previous
order, section 1983 provides no federal remedy for such a claim and looks to the
applicable state law for a remedy.  (Doc. 73 at 16-18).  Kini Seawright has asked for
"general damages, including . . . wrongful death" on her claims.  (Doc. 53 at 22).  The
Officer Defendants have made no argument for why Kini Seawright cannot seek damages
for wrongful death under her section 1983 claim.  As the Court has explained, under
Arizona law and pursuant to section 1983, Kini Seawright cannot pursue damages for her
own pain and suffering on her section 1983 claim under the Eighth Amendment, but she
can pursue damages for the wrongful death of her son.  (Doc. 73 at 16-18).  If Kini
Seawright's claim were to survive the Officer Defendants' qualified immunity challenge,
*see infra* Section II.A.2, the Court would apply a federal remedy that permits the recovery
of such damages. *See, e.g., Berry v. City of Muskogee*, 900 F.2d 1489, 1507 (10th Cir.
1990); *Bass by Lewis v. Wallenstein*, 769 F.2d 1173, 1190 (7th Cir. 1985).

### ii.    The Estate's Section 1983 Claim

Next, the Officer Defendants argue that the Estate has no section 1983 claim for
Dana's pre-death pain and suffering.  (Doc. 83 at 5-16).  The Court has explained that the
Estate can bring a section 1983 claim seeking damages for Dana's pre-death pain and
suffering if the facts support such damages.  (Doc. 73 at 13-16).

In this case, the facts support damages for pre-death pain and suffering.  "Before a
decedent's beneficiary may recover for the decedent's pre-death pain and suffering, the

---

is Count One.  Count One invokes only the Fourth and Eighth Amendments.  (Doc. 53 at
9).  Count Two invokes the Fourth and Fourteenth Amendments.  (*Id*. at 13).  Count Two,
however, was previously dismissed by the Court and Count Two was only made against
Defendant Charles Ryan to begin with, not the Officer Defendants.  (*Id*. at 13).

beneficiary must show by a preponderance of the evidence 'that the decedent was conscious for at least some period of time after he suffered the injuries which resulted in his death.'" *F/V Carolyn Jean, Inc. v. Schmitt*, 73 F.3d 884, 885 (9th Cir. 1995) (quoting *Cook v. Ross Island Sand & Gravel Co*., 626 F.2d 746, 749-50 (9th Cir. 1980)). Defendants argue that there is no evidence that Dana ever regained consciousness after the assault.  (Doc. 83 at 5).  However, the Court of Appeals in *F/V Carolyn Jean* went on to explain that "[a]lthough eyewitness evidence of the decedent's consciousness is not essential, merely alleging pain and suffering is insufficient where the record supports a finding of almost instantaneous death."  *Id.* (citations omitted).

The record does not support an instantaneous death and suggests that Dana was conscious following the attack.  Dana was attacked by fellow inmates sometime between 7:22 and 7:56 a.m. on July 3, 2010.  Dana was stabbed and beaten in the attack.  He died as a result of injuries suffered in the attack on July 7, 2010.  He was first discovered by Defendant Jackson-Bey at 7:56.   Jackson-Bey testified that when she tried to communicate with Dana he would make a moaning noise each time she called his name. (Doc. 96-1 at 47).  Further, the Arizona Department of Corrections Executive Report filed after the attack states "[a]t the time of this report Seawright was breathing on his own and was conscious."  (*Id.* at 153).   From these facts it is undisputed that Dana did not experience an instantaneous death in the attack.  There is at the very least a disputed issue of fact over whether he was conscious when Jackson-Bey found him and tried to communicate with him.  The Court finds this is enough evidence for a reasonable jury to allow the Estate to recover damages for Dana's pre-death pain and suffering if the jury found for the Estate on the section 1983 claim.  Further, as explained above, *see supra* Section II.A.1, the Estate has presented enough evidence to show there is a question of fact regarding whether the remaining Officer Defendants violated Dana's Eighth Amendment rights.   Accordingly, because the Estate's section 1983 claim survives Defendants' constitutional challenge on the merits, the Court could apply a federal remedy that permits the Estate to recover damages for Dana's pre-death pain and suffering.  *See,*

*e.g., McClurg v. Maricopa Cnty.*, CIV-09-1684-PHX-MHB, 2011 WL 4434029 (D. Ariz. Sept. 23, 2011); *Berry*, 900 F.2d at 1507; *Bass*, 769 F.2d at 1190.

## 2.    Qualified Immunity

In addition to their argument that Plaintiffs' section 1983 claim fails on the merits, the Officer Defendants have also argued for qualified immunity.  (Doc. 83 at 12-16). Qualified immunity is "an immunity from suit rather than a mere defense to liability . . . ." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985).  A defendant in a section 1983 action is entitled to qualified immunity from damages for civil liability if his or her conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.  *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).

There is a two-step sequence for resolving a qualified immunity claim: the "constitutional inquiry" and the "qualified immunity inquiry."  *Saucier v. Katz*, 533 U.S. 194, 201 (2001).  The "constitutional inquiry" asks whether, when taken in the light most favorable to the non-moving party, the facts alleged show that the official's conduct violated a constitutional right.  *Id*.  If so, a court turns to the "qualified immunity inquiry" and asks if the right was clearly established at the relevant time.  *Id*. at 201-02.  Courts are "permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).  The Court has already addressed the constitutional inquiry.  As discussed above, *see supra* Section II.A.1, a question of fact exists over whether the Officer Defendants' conduct violated a constitutional right.  Thus, the Court turns to the qualified immunity inquiry.  This second inquiry "must be undertaken in light of the specific context of the case, not as a broad general proposition."  *Saucier*, 533 U.S. at 201.

While both inquiries determine whether there was a substantial risk of serious harm, "the qualified immunity inquiry 'has a further dimension'" than the constitutional inquiry in an Eight Amendment case.  *Estate of Ford v. Ramirez-Palmer*, 301 F.3d 1043, 1049 (9th Cir. 2002) (quoting  *Saucier*, 533 U.S. at 205).  In a claim under section 1983

based on an alleged violation of the Eighth Amendment, "[e]ven though the constitutional issue turns on the officers' state of mind (here, deliberate indifference to a substantial risk of serious harm), courts must still consider whether—assuming the facts in the injured party's favor—it would be clear to a reasonable officer that his conduct was unlawful." *Id.* at 1045.

"The concern of the immunity inquiry is to acknowledge that reasonable mistakes can be made as to the legal constraints on particular police conduct." *Saucier*, 533 U.S. at 205. "The Court emphasized that it is often difficult for an officer to determine how the relevant legal doctrine will apply to the factual situation that he faces." *Estate of Ford*, 301 F.3d at 1049. "This is why 'all but the plainly incompetent or those who knowingly violate the law' have immunity from suit; officers can have a reasonable, but mistaken, belief about the facts or about what the law requires in any given situation." *Id.* (quoting *Saucier*, 533 at 202; also citing *Jeffers v. Gomez*, 267 F.3d 895, 909 (9th Cir. 2001) (noting in Eighth Amendment case that in *Saucier* "the Court emphasized the broad discretion that must be afforded to police officers who face tense situations, and the importance of granting immunity even when officers make mistakes")).

In *Estate of Ford*, the family of a state inmate who was killed by his cellmate brought a section 1983 action based on a violation of the Eighth Amendment against correctional officers who allowed the decedent to be double-celled with the cellmate. 301 F.3d 1043. The district court denied defendant officers' motions for summary judgment on a qualified immunity defense. *Id.* The Ninth Circuit Court of Appeals reversed. *Id.* The Court of Appeals found that the district court erred by denying a qualified immunity defense solely because there was a triable issue of fact as to whether the correctional officers were deliberately indifferent. *Id.* at 1045. As discussed above, *see supra* Section II.A.1, the Court is faced with the same issue here—the Court has found that there is a triable issue of fact as to whether the Officer Defendants were deliberately indifferent.

The Court of Appeals explained in *Estate of Ford* that "a reasonable prison official understanding that he cannot recklessly disregard a substantial risk of serious harm, could

know all of the facts yet mistakenly, but reasonably, perceive that the exposure in any given situation was not that high.  In these circumstances, he would be entitled to qualified immunity." *Id*. at 1050 (citing *Saucier*, 533 U.S. at 205).   To determine qualified immunity the Court must ask "whether the constitutional right that would be violated was clearly established." *Id*.  Finding whether a constitutional right is clearly established "is a two-part inquiry: (1) Was the law governing the state official's conduct clearly established?  (2) Under that law could a reasonable state official have believed his conduct was lawful?  However, the relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. (quoting *Saucier*, 533 U.S. at 202).   A correctional officer is entitled to qualified immunity if it would not have been clear to a reasonable correctional officer, knowing what the officer in question knew, that their conduct posed such a substantial risk of serious harm that doing so would be constitutionally impermissible. *Id*. at 1053.

In *Estate of Ford*, the Court of Appeals explained that "before the decision to double cell [the decedent] with [the cellmate] was made, it would have been clear to a reasonable prison official that if he knew about an excessive risk to inmate safety, and inferred from the facts of which he was aware that a substantial risk of serious harm exists, he would violate the law by disregarding it.  He would also have known that merely being negligent, or failing to alleviate a significant risk that he should have perceived but did not, is not constitutionally deficient conduct." *Id*. at 1050 (citing *Farmer*, 511 U.S. at 835, 838).  The Court of Appeals also,

> emphasized that determining whether the law was clearly established "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  Therefore, it is not sufficient that *Farmer* clearly states the general rule that prison officials cannot deliberately disregard a substantial risk of serious harm to an inmate; here, in addition, it is relevant that neither *Farmer* nor subsequent authorities has fleshed out "at what point a risk of inmate assault becomes sufficiently substantial

for Eighth Amendment purposes." *Farmer*, 511 U.S. at 834 n. 3; cf. *Helling v. McKinney*, 509 U.S. 25, 36, 113 S.Ct. 2475, 125 L.Ed.2d 22 (1993) (indicating in second-hand smoke case that a risk is intolerable under the Eighth Amendment when it violates contemporary standards of decency to expose anyone unwillingly to it). Thus, it would not be clear to a reasonable prison official when the risk of harm from double-celling psychiatric inmates with one another changes from being *a* risk of *some* harm to a *substantial* risk of *serious* harm. *Farmer* left that an open issue. This necessarily informs "the dispositive question" of whether it would be clear to reasonable correctional officers that their conduct was unlawful in the circumstances that [the correctional officers] confronted.

*Id.* at 1050-51.

In analyzing the facts of the case, the Court of Appeals found that the correctional officers knew of the aggressor cellmate's violent history toward other cellmates, but they had no knowledge of a specific threat to inmate that was killed. *Id.* at 1051-53. The facts did not establish that the risk of some harm changed to such a substantial risk of serious harm that made their actions clearly unlawful. Accordingly, the Court of Appeals overturned the district court's decision not to grant qualified immunity; finding that while the correctional officer's conduct turned out to be quite unfortunate judgments, the Court of Appeals could not say that a reasonable correctional officer would have clearly understood that the risk of serious harm was so high that he should not have authorized the double-celling. *Id.* at 1053.

Thus, in this case the Court is faced with determining what the Officer Defendants actually knew, and if their conduct in light of that knowledge posed such a substantial risk of serious harm that doing so would be constitutionally impermissible. Viewing the evidence in the light most favorable to Plaintiffs, Thompson knew he was short staffed, he was concerned about being short staffed, and he called the Deputy Warden due to the manpower issue that morning. Further, the evidence shows that Thompson had no control over the number of staff members that were available to him and he made staffing decisions that caused the least amount of disruption based on the staff members he had

1    available that morning.   (Doc. 84 at ¶¶22-61).   Even if the Court determined that

2    Thompson's conduct was negligent, "negligence, or failure to avoid a significant risk that

3    should be perceived but wasn't, 'cannot be condemned as the infliction of punishment,'"

4    and cannot disqualify Thompson from qualified immunity.  *Estate of Ford*, 301 F.3d at

5    1052 (quoting *Farmer*, 511 U.S. at 838).

6         Similar to the officers in *Estate of Ford*, there is no evidence that Thompson knew

7    a substantial risk of serious harm to Dana existed.   Thompson testified in his deposition

8    that he did not know who Dana was prior to the assault (Doc. 84 at ¶73) and Plaintiffs

9    have provided no evidence to dispute this fact.   Thompson did not know why Dana had

10   been moved to Pod D prior to the assault nor did Thompson know of any relationships

11   Dana had with other inmates prior to the assault.  (*Id*. at ¶¶ 74-77).

12        Plaintiffs point to circumstantial evidence to support their argument for what the

13   Officer Defendants knew prior to the assault.   The Court does not find this evidence

14   persuasive.   Evidence must show that the Officer Defendants had knowledge of such a

15   substantial risk of serious harm to Dana that they would know their actions violated clearly

16   established law.   Plaintiffs argue that an Information Report filed six days after the assault

17   and prepared by a correctional officer in a different Dorm than Dana's at Stiner Unit is

18   "very telling regarding the dangerous conditions at Stiner prior to Seawright's murder."

19   (Doc. 96 at ¶10).   However, this report begins "On the above date" and is dated July 9,

20   2010, six days following Dana's assault.   Further the report makes no statement about

21   conditions in Dorm 2 or at Stiner Unit prior to or on the date Dana was assaulted.

22   Consequently, this report says nothing about the conditions in the area Thompson oversaw

23   on the morning of July 3rd nor does any other circumstantial evidence that Plaintiffs have

24   offered.

25        Plaintiffs also argue that Dana was assaulted because he was a known homosexual

26   and because he had engaged in homosexual conduct with members of another race, and

27   that the Officer Defendants knew these facts.   Plaintiffs make this assertion because

28   Mexican-American inmates had previously assaulted George Mendez, the Mexican-

American inmate that Dana had previously engaged in homosexual conduct with, because Mendoza had engaged in this conduct with someone (i.e. Dana) outside Mendez's race. (Doc. 97 at 13).  However, the same circumstantial evidence proffered by Plaintiff also suggests Dana was attacked in retaliation for attacking another inmate on July 2nd.  The evidence shows Dana had engaged in homosexual conduct with inmate Hamilton (*id.* at 14), that Hamilton was an African-American inmate (Doc. 96-1 at 98-99), that Dana attacked Hamilton on July 2nd (Doc. 97 at 14), that Dana was moved after the attack (*id.*), and that Dana was attacked by Hamilton and other African-American inmates on July 3rd (*id.*).  Accordingly, Plaintiffs' own evidence gathered after the assault suggests multiple reasons for the attack—retaliation for a prior attack, retaliation for being a homosexual, retaliation for homosexual conduct with members of another race, or some combination of the aforementioned.  Yet Plaintiffs argue that the Officer Defendants had this knowledge and more clarity regarding this knowledge prior to the attack, or in the alternative that all of these reasons somehow add up to knowledge on the part of the Officer Defendants.  Regardless of what this contradicting circumstantial evidence shows, there is no evidence to support the claim that the Officer Defendants had any knowledge of an alleged risk from African-American inmates in Pod D Dorm 2 to Dana on the morning of July 3rd.  There is even less evidence to support the assertion that the Officer Defendants' alleged knowledge of any risk to Dana changed from a risk of some harm to knowledge of a substantial risk of serious harm on the morning of July 3rd.

Plaintiffs' argument concerning the circumstantial evidence of the motive for Dana's assault can be summed up by the proposition that because the inmates purportedly knew why Dana was attacked after the assault (which is still not necessarily clear), the Officer Defendants must have known Dana would be attacked and why prior to the assault.  This is not enough to survive Defendants' Motion for Summary Judgment.  While the Court has found above, *see supra* Section II.A.1.a., that a question of fact exists regarding whether Thompson was aware of a substantial risk in the constitutional inquiry, there is not enough evidence to establish a question of fact regarding whether Thompson was aware

that his conduct was unlawful in the qualified immunity inquiry.  In these circumstances the Court cannot say that a reasonable officer in Thompson's position would necessarily have perceived that collapsing a dorm in Blue Yard was unlawful in the situation he confronted nor can the Court find that a reasonable officer would perceive that the risk to Dana of collapsing a dorm under these circumstances was so high as to be constitutionally impermissible.  Therefore, the right was not clearly established and Thompson is entitled to qualified immunity.

Similarly, Jackson-Bey was tasked with overseeing the security of Dorm 1 on the morning of July 3rd.  At some point between 7:22 and 7:56 a.m., Blondin gave Jackson-Bey the keys to Dorm 2 where Dana was housed so that Jackson-Bey could secure Dorm 2 inmates returning from the dining hall.  (Doc. 84 at ¶102).  No evidence suggests that Jackson-Bey was tasked with or thought she needed to perform a security check of Dorm 2 when Blondin gave her the keys to secure Dorm 2.  As Jackson-Bey was securing Dorm 2 she heard inmates banging on a window to get her attention and inform her that someone needed medical attention.  (*Id*. at ¶103).  While she testified that the day was out of the ordinary because she had never seen a unit that short staffed, the Court cannot say that a reasonable officer in her position would have perceived that failing to conduct another security check in a dorm that she was not assigned to without being told to do so was unlawful in the situation she confronted or the risk of not acting was so high as to be constitutionally impermissible.

Accordingly, the Court finds that both Defendants Thompson and Jackson-Bey are entitled to qualified immunity because it would not have been clear to a reasonable correctional officer, knowing what each knew, that collapsing a dorm under the circumstances or not ensuring another security check was done in Dorm 2 created such a substantial risk of serious harm to Dana that made these actions unlawful.  Therefore, the Court grants Defendants' Motion for Summary Judgment with regard to Defendants Thompson and Jackson-Bey on their qualified immunity defense.

Further, even assuming, *arguendo*, that there was enough evidence to create a

triable issue of fact regarding whether Defendant Blondin violated Dana's Eighth Amendment rights, she would still also be entitled to qualified immunity.  Defendant Blondin was assigned to Dorm 2 on July 3rd and was then also assigned to Dorm 3 in the hour Dana was assaulted.  After performing her assigned security check in Dorm 2 at 7:22 a.m. she gave the keys to Jackson-Bey and assumed Jackson-Bey would perform the second security check that hour.  There was a miscommunication between Blondin and Jackson-Bey because Jackson-Bey did not know another security check needed to be done.  Blondin assumed Jackson-Bey would be securing Dorm 2 inmates returning from the dining hall and that Jackson-Bey would be in Dorm 2.  Given these circumstances, a reasonable officer in her position would not have perceived that following orders to cover Dorm 3 and assuming Jackson-Bey was inside Dorm 2 was unlawful in the situation she confronted or the risk of not communicating with Jackson-Bey further was so high as to be constitutionally impermissible.

### B.   Remaining Claims

The three remaining claims in this case are Counts Three, Four, and Five; all three claims are made solely against the State of Arizona.  (Doc. 53 at 19-21).  In their moving papers, Defendants have only raised a valid argument for granting summary judgment on Count Three and part of Count Five.  (Doc. 83; Doc. 107).  Defendants failed to address Count Four in their Motion for Summary Judgment (Doc. 83) and only minimally addressed their failure to do so in their Reply[4] (Doc. 107 at 15-16).  Defendants have also

---

[4]        In Count Four of the Second Amended Complaint, Plaintiffs allege that the State violated Plaintiffs' rights under "Article 2, section 2 of the Arizona Constitution guarantee[ing] persons due process of law, and Article 2, section 15 of the Arizona Constitution [that] forbids cruel and unusual punishment."  (Doc. 53 at 21).  In spite of Defendants telling the Court that they are moving for summary judgment on all remaining Counts in the Second Amended Complaint (Doc. 83 at 1), as Plaintiffs point out (see Doc. 97 at 2-3), Defendants motion for summary judgment failed to address Count Four of the Second Amended Complaint.  In their Reply, Defendants argue that they did not need to address Count Four because it "was not a serious claim" as "Arizona courts have consistently evaluated cruel and unusual treatment claims under the Arizona and U.S. Constitutions identically" so if "summary judgment is granted on Plaintiff's Eighth Amendment claims, it should also be granted on the Arizona Constitutional claim.

1    failed to address the part of Plaintiffs' wrongful death claim in Count Five premised on

2    violations of the Arizona Constitution (Doc. 53 at 21-22).  As a result, the Court is left to

3    address these claims on its own.

4         "[A] district court 'may grant summary judgment on any legal ground the record

5    supports.'"  *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192, 1202 (9th Cir. 2001) (quoting 6

6    James W. Moore, Walter J. Taggart and Jeremy C. Wicker, Moore's Federal Practice ¶

7    56.14[1] (1994)).  Plaintiffs were put on notice that Defendants were seeking summary

8    judgment on all claims.  Accordingly, the Court will address whether disputed issues of

9    fact for trial are present as to these remaining claims.

10        The Eleventh Amendment provides, "The Judicial power of the United States shall

11   not be construed to extend to any suit in law or equity, commenced or prosecuted against

12   one of the United States by Citizens of another State, or by Citizens or Subjects of any

13   Foreign State."  U.S. CONST. amend. XI.  Under the Eleventh Amendment, States are

14   immune from suit in federal court for state or federal causes of action by private parties.

15   *In re Mitchell*, 209 F.3d 1111, 1115–16 (9th Cir. 2000), overruled in part on other

16   grounds, *Kimel v. Fla. Bd. of Regents*, 528 U.S. 62 (2000).

17        Although Eleventh Amendment immunity is not absolute, the United States

18   Supreme Court has recognized only two circumstances under which an individual may

19   sue a State in federal court.  *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ.*

20   *Expense Bd.*, 527 U.S. 666, 670 (1999).  First, Congress may authorize suit against the

21   States in the exercise of its power to enforce the Fourteenth Amendment.  *Id*.  Second, a

22   State may waive its sovereign immunity by consenting to suit.  *Id*.  If Congress has not

23   abrogated Arizona's Eleventh Amendment immunity for purposes of this suit and

24   Arizona has not waived that immunity, then the Court lacks jurisdiction over this case.

25   *Id*. at 691.

26        Neither party has argued that Congress abrogated the State's Eleventh Amendment

27   immunity for purposes of the claims in this case.  Thus the Court turns to whether

28

The analysis is identical."  (Doc. 107 at 15-16) (citations omitted).

Arizona has waived its sovereign immunity—the Court finds that it has. Eleventh Amendment immunity is an affirmative defense. *Hill v. Blind Indus. & Servs. of Md.*, 179 F.3d 754, 760 (9th Cir. 1999) (citing *In ITSI TV Prods., Inc. v. Agric. Ass'ns,* 3 F.3d 1289 (9th Cir. 1993)).

> [L]ike every other defendant, a state must timely object to the forum or be deemed to have waived its objections. The Eleventh Amendment was never intended to allow a state to appear in federal court and actively litigate the case on the merits, and only later belatedly assert its immunity from suit in order to avoid an adverse result.

*Id.* at 763.

In this case, at oral argument the State asserted that it did not raise an Eleventh Amendment defense because the claim was originally filed in state court and removed by the Defense to federal court. This statement, however, is not true. This claim was originally filed in this Court on June 30, 2011. *See* (Doc. 1). Thus, apparently due to oversight the State has not raised an Eleventh Amendment defense to Plaintiffs' claims. Accordingly, the Court finds that the State has waived any immunity afforded to it by the Eleventh Amendment by this point in the case.

### 1.      Vicarious Liability of the State

The Court now turns to Plaintiffs' claims in Counts Three, Four, and Five. The State of Arizona, as a party, can only be held liable for Plaintiffs' claims against it under a theory of vicarious liability in the circumstances of this case. There are no disputed facts to show otherwise. In setting oral argument, the Court ordered "the parties [to] come to oral argument prepared to address whether the State of Arizona can be vicariously liable under a *respondeat superior* theory if all of the actors upon whose actions liability would be premised were granted summary judgment." (Doc. 112). In spite of this order, neither party addressed this issue at oral argument.

Under Arizona law, "[w]hen a judgment on the merits—including a dismissal with

prejudice—is entered in favor of the 'other person' in A.R.S. § 12–2506(D)(2)[5] [i.e. the Officer Defendants here], there is no fault to impute and the party potentially vicariously liable [i.e. the State here] is not 'responsible for the fault' of the other person." *Law v. Verde Valley Med. Ctr.*, 170 P.3d 701, 705 (Ariz. Ct. App. 2007) (footnote added).  As discussed above, *see supra* Section II.A.2., the actors, or other persons, whom the State would be liable for under this theory cannot be held liable due to qualified immunity and a judgment on the merits will be entered in their favor.  Consequently, there is no remaining party to this suit who's actions the State can be held liable for and there is no fault to impute to the State.  Therefore, the Court will grant summary judgment to the State on Counts Three, Four, and Five.

### 2.    Kini Seawright's Negligence Claims

Even if the Court were to consider Plaintiff Kini Seawright's gross negligence claim in Count Three and the portion of Kini Seawright's wrongful death claim in Count Five premised on negligence and/or gross negligence, the Court would still grant summary judgment to the State on Count Three and any claim for wrongful death in Count Five premised on negligence.

In Count Three, Plaintiff Kini Seawright alleges that the State is guilty of "Negligence and/or Gross Negligence."  (Doc. 53 at 19).  There is no simple negligence claim against a public entity under Arizona law when an inmate injures another inmate. *See* A.R.S. § 12-820.02(A)(4).  Plaintiff must prove that the State intended to cause the injury or was grossly negligent. *Id.*

Defendants argue that Plaintiff will not be able to prevail on her gross negligence claim because she will not be able to establish the standard of care to which Defendants had a duty to conform.  The Court agrees, and finds that Plaintiff would be required to proffer an expert witness to establish the applicable standard of care in this case; something she has not done and will not be able to do now that discovery has ended.

---

[5]    A.R.S. § 12–2506 abolishes joint and several liability.  However, "[s]ubsection 12-2506(D)(2) preserves the vicarious liability of a principal or master for the conduct of an agent or servant." *Law*, 170 P.3d at 704.

Another Court in this district addressed this very issue in *Porter v. Arizona Department of Corrections*, and explained,

> "Ordinarily, the standard of care to be applied in a negligence action focuses on the conduct of a reasonably prudent person under the circumstances." *Sw. Auto Painting and Body Repair, Inc. v. Binsfeld*, 904 P.2d 1268, 1272 (Ariz. Ct. App. 1995). "In such cases, it is not necessary for the plaintiff to present evidence to establish the standard of care because the jury can rely on its own experience in determining whether the defendant acted with reasonable care under the circumstances." *Bell v. Maricopa Med. Ctr.*, 755 P.2d 1180, 1182 (Ariz. Ct. App. 1988). "However, when a person holds himself out to the public as possessing special knowledge, skill, or expertise, he must perform according to the standard of his profession." *Sw. Auto Painting and Body Repair*, 904 P.2d at 1272. "Where, . . . the alleged lack of care occurred during the professional or business activity, the plaintiff must present expert testimony as to the care and competence prevalent in the business and profession." *St. Joseph's Hospital v. Reserve Life Ins. Co.*, 742 P.2d 808, 816 (Ariz. 1987).
>
> Defendant contends that a professional standard of care applies here because a prison is a specialized setting with specialized concerns and corrections officers have specialized training and are held to a different standard than typical citizens. As proof, defendant cites to DOC Order 509.02.1.1, which provides that "[e]mployees in the Correctional Officer Series shall complete a minimum of 360 hours of pre-service training." Because it contends that this is a professional standard of care case, defendant argues that plaintiff must present expert testimony as to the care and competence required by correction officers.

*Porter v. Ariz. Dep't of Corr.*, 2:09-CV-2479-HRH, 2012 WL 7180482, at *3 (D. Ariz. Sept. 17, 2012) (footnote omitted). The Court in *Porter* held that it was a professional standard of care case and expert testimony was required "to help the jury understand what the proper standard of care is in a gross negligence case involving a correctional facility." *Id*. at *5.

In this case, Plaintiff concedes "that the law in Arizona requires an expert witness

to establish the standard of care for Plaintiffs' gross negligence and wrongful death claims." (Doc. 97 at 25) (citing *Porter*, 2012 WL 7180482, at *4-*5). However, Plaintiff filed a motion with the Court to re-open discovery and allow Plaintiff to find such an expert.   (Doc. 94).   The Court denied Plaintiff's motion for failure to justify reconsideration. (Doc. 115). Consequently, Plaintiff has not retained an expert witness nor will she be able to get an expert witness since discovery ended over nine months ago and the Court has denied her motion to re-open discovery. Thus, Plaintiff has failed to establish and will not be able to establish the proper standard of care under Arizona law in a gross negligence case involving correctional officers. As a result, even if the Court were to address Count Three, the Court would grant Defendants' Motion for Summary Judgment on Count Three against the State and Plaintiff's wrongful death claim premised on gross negligence in Count Five.

**III.   CONCLUSION**

Based on the foregoing,

**IT IS ORDERED** that Defendants' Motion for Summary Judgment (Doc. 83) is granted.

**IT IS FURTHER ORDERED** that Plaintiffs' Motion to Exceed the Page Limit for their Response (Doc. 95) is denied as moot.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall enter judgment in favor of Defendants and against Plaintiffs, with Plaintiffs to take nothing.

**IT IS FINALLY ORDERED** that the Clerk of the Court shall close this case.

Dated this 4th day of September, 2013.

James A. Teilborg
Senior United States District Judge